No. 52,474

Linda Rae Stephens, *Plaintiff-Appellant,* v. Snyder Clinic Asso-
ciation and James N. Winblad, M.D., *Defendants-Appellees.*

(631 P.2d 222)

Opinion filed
July 17, 1981.

*Robert D. Ochs,* of Fisher, Ochs, and Heck, P.A., of Topeka, argued the cause,

and *Ronald D. Heck,* of the same firm, and *Gary M. Peterson,* of Topeka, were with him on the briefs for the appellant.

*Alvin D. Herrington,* of McDonald, Tinker, Skaer, Quinn & Herrington, of Wichita, argued the cause, and *Ronald P. Williams,* of the same firm, was with him on the brief for the appellees.

*Charles E. Hill,* attorney, Kansas Insurance Department, and *Derek J. Shafer,* special assistant attorney general, were on the brief *amicus curiae* for Fletcher Bell, Commissioner of Insurance.

*Wayne T. Stratton* and *Charles R. Hay,* of Goodell, Stratton, Edmonds, Palmer & Wright, of Topeka, were on the brief *amici curiae* for the Kansas Medical Society and Kansas Hospital Association.

The opinion of the court was delivered by

PRAGER, J.: This is an action to recover damages for alleged medical malpractice resulting from the insertion of an intrauterine contraceptive device (IUD). The district court held that plaintiff's cause of action was barred by the applicable statute of limitations (K.S.A. 60-513).

On this appeal, we will assume that the following facts are true: The plaintiff-appellant, Linda Rae Stephens, is a resident of Topeka, Kansas. The defendant-appellee, Dr. James N. Winblad, M.D., is a medical doctor licensed to practice in Kansas. The defendant-appellee, Snyder Clinic Association, is a professional association of medical doctors located in Winfield, Kansas. Defendant Winblad was formerly associated with the Snyder Clinic, and it will be assumed that at all times he was acting as an agent and employee of Snyder Clinic.

On December 19, 1969, Dr. Winblad inserted in the plaintiff's uterus, for the purpose of contraception, a Lippes Loop intrauterine device (IUD). Shortly, thereafter, plaintiff, following the manufacturer's instructions, noticed that she could not find the tail string that was attached to the IUD for the purpose of checking to insure the device was properly situated in her uterus. She immediately contacted Dr. Winblad. He assured her that the device was designed to be expelled from the uterus if a problem arose with the fitting of the IUD. Approximately three months after the IUD was inserted, the plaintiff became pregnant with her second child. While she was under the care of Dr. Winblad, she again inquired as to whether the IUD could possibly still be in her uterus. Dr. Winblad again assured her that the device had been expelled. The plaintiff, after giving birth to her second child on January 18, 1971, suffered continuous problems with blood

discharge from the uterus. During this period of time, she consulted with and was treated by various physicians for this problem with no success. Finally, upon the recommendation of Dr. William Roy of Topeka, Kansas, plaintiff underwent a hysterectomy which was performed at Topeka, Kansas, on November 5, 1979. The pathologist's report from the hospital laboratory indicated that the plaintiff's uterus was healthy with the exception that a IUD was found imbedded into the wall of the healthy uterus.

Plaintiff's claim against Dr. Winblad and the Snyder Clinic is based upon the alleged negligence of Dr. Winblad in the insertion of the IUD on December 19, 1969, and in his failure to discover the improper placement of the device as late as January, 1971. Her primary complaint is that, after the plaintiff notified Dr. Winblad that the IUD was not in place, Winblad had a duty to examine the plaintiff, either by physical examination or x-ray, to insure that the device was not still in the uterus of the plaintiff. The last dates on which the act or omission which forms the basis of plaintiff's claim could have occurred were January 6, 1971, as to Dr. Winblad and August 6, 1971, as to the Snyder Clinic.

On December 18, 1979, plaintiff filed the present action in Cowley County District Court to recover compensatory and punitive damages for the alleged wrongful acts of the defendants. On January 15, 1980, the defendants filed a motion for summary judgment. The basis for the motion for summary judgment was that the plaintiff's cause of action was barred by the applicable statute of limitations (K.S.A. 60-513). The district court sustained the motion for summary judgment on that basis, and the plaintiff has appealed.

Before turning to the specific points raised on the appeal, it should be noted that the statute of limitations problem in this case arose because of an amendment to K.S.A. 60-513 passed by the Kansas legislature in 1976. To understand the issues, we must carefully examine the statutory provisions. The pertinent statute of limitations, which was in effect in 1974 prior to the 1976 amendment, was K.S.A. 1974 Supp. 60-513. K.S.A. 1974 Supp. 60-513 provided in part as follows:

"**60-513. Actions limited to two years.** The following actions shall be brought within two (2) years:

. . . .

"(4) An action for injury to the rights of another, not arising on contract, and not herein enumerated.

. . . .
"The cause of action in this section shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall the period be extended more than ten (10) years beyond the time of the act giving rise to the cause of action."

It is important to note that, under the 1974 statute, an action in tort for personal injuries resulting from negligence had to be brought within two years from the time the act giving rise to the cause of action first caused substantial injury, or, if the fact of injury was not reasonably ascertainable until some time after the initial act, then the period of limitation did not commence until the fact of injury became reasonably ascertainable to the injured party. Under that statute, the period could not be extended more than *ten years* beyond the date of the "act giving rise to the cause of action." If the 1974 statute had been in existence at the time plaintiff's action was filed in 1979, plaintiff's action would have been timely filed, since the alleged negligent act giving rise to the cause of action occurred in 1971 and plaintiff's suit was filed on December 18, 1979, which was clearly within the ten-year period.

Unfortunately for the plaintiff, the Kansas legislature, in 1976, amended K.S.A. 60-513. The amendments were made as a result of a review and study by a Special Interim Committee on Medical Malpractice on the effect of medical malpractice actions on the distribution and provision of medical and hospital care for Kansas residents. As a result of this study a package of twelve separate bills was recommended to the legislature by the special committee. The medical "malpractice package" contained a number of elements, among which were: (1) The requirement that each health care provider maintain a policy of professional liability insurance with limits of $100,000 per occurrence and $300,000 per year (K.S.A. 1980 Supp. 40-3402); (2) establishment of a joint underwriting association to supplement the existing market for professional liability coverage (K.S.A. 1980 Supp. 40-3413); (3) establishment of the Health Care Stabilization Fund, which is, in effect, an "excess" insurance carrier, providing coverage in excess of the basic required limits and administered by the Commissioner of Insurance (K.S.A. 1980 Supp. 40-3403); (4) modification

of the Collateral Source rule in health provider cases (K.S.A. 60-471; and (5) reduction of the "discovery period" of the statute of limitations in medical malpractice actions and a redefining of the point of time when such actions accrue (K.S.A. 60-513[c]).

K.S.A. 60-513, as amended in 1976, provides in part as follows:

"**60-513. Actions limited to two years.** (a) The following actions shall be brought within two (2) years:

. . . .

"(4) An action for injury to the rights of another, not arising on contract, and not herein enumerated.

. . . .

"(7) An action arising out of the rendering of or failure to render professional services by a health care provider, not arising on contract.

"(b) *Except as provided in subsection (c)* of this section, the cause of action in this action [section] shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall the period be extended more than ten (10) years beyond the time of the act giving rise to the cause of action.

"(c) *A cause of action arising out of the rendering of or the failure to render professional services by a health care provider* shall be deemed to have accrued at the time of the occurrence of the act giving rise to the cause of action, unless the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, *but in no event shall such an action be commenced more than four (4) years beyond the time of the act giving rise to the cause of action.*

"(d) *The provisions of this section as it was constituted prior to the effective date of this act shall continue in force and effect for a period of two (2) years* from the effective date of this act *with respect to any act* giving rise to a cause of action *occurring prior to the effective date of this act.*" (Emphasis supplied.)

It is important to note the changes in K.S.A. 60-513 which were accomplished by the amendments of 1976. In section (a) of K.S.A. 60-513, an additional category of actions was added to the list of actions previously covered by that section. This was an action arising out of the rendering of or failure to render professional services by a health care provider, not arising on contract. Thus actions for tortious injury resulting from the negligence of a health care provider were placed in a special classification, separate and apart from actions in tort arising from the negligence of other persons. Section (b) of the 1974 act was amended to change the "discovery period" in actions brought against health care providers from ten years to four years. This was accomplished by

the adding of subsection (*c*) which is quoted in full above. Section (*d*) of 60-513 granted a grace period of two years from the effective date of the 1976 amendments (July 1, 1976) during which existing causes of action might be filed. After that date, the 1976 act would be applicable and such actions would be controlled by the four-year limitation.

In opposition to defendants' motion for summary judgment, the plaintiff contended in the district court, as she does in this court on appeal, that her cause of action against the defendants was not barred by K.S.A. 60-513 for three reasons:

(1) The 1976 amendments to K.S.A. 60-513 are not applicable to plaintiff's action;

(2) K.S.A. 60-513(*c*) constitutes special legislation in violation of Article 2, Section 17, of the Kansas Constitution;

(3) K.S.A. 60-513(*c*) is in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution and Sections 1 and 2 of the Kansas Bill of Rights.

In considering the applicability of the 1976 amendments to the plaintiff's cause of action in this case, it must be emphasized at the outset that the plaintiff does not dispute that the legislature has the power to shorten an existing statute of limitations, provided a reasonable time is given for a person having an existing cause of action to commence an action before the bar takes effect. This principle of law was stated in *Milbourne v. Kelley,* 93 Kan. 753, 145 Pac. 816 (1915). Likewise, the plaintiff does not argue the unreasonableness of the "two year grace period" provided by K.S.A. 60-513(*d*), but urges that the language in that section did not express an unequivocal intent that the 1976 amendments should have retrospective operation. We find no merit to this contention, since K.S.A. 60-513(*d*) clearly expresses the legislative intent to bar certain actions after the grace period, where injuries occurred prior to the effective date of the act. Our problem, of course, is to determine what the legislature intended by the language used in K:S.A. 60-513(*d*).

The thrust of the defendant's argument is essentially this: Subsection (*d*) of 60-513 does not apply to the plaintiff's cause of action, because section (*d*) is applicable only to acts giving rise to a cause of action *which actually accrued* prior to the effective date of the amendments, July 1, 1976. Here plaintiff did not discover the improper placement of the IUD, nor did she suffer substantial

injuries, until the hysterectomy was performed in 1979. It was only then that plaintiff's cause of action accrued. The negligent act of defendants was not an "act giving rise to a cause of action occurring prior to the effective date of [the] act" because no cause of action had yet accrued at that time. Hence, the 1976 amendments did not bar her cause of action. Stated simply, plaintiff contends that what the legislature did intend was for K.S.A. 60-513(*d*) to apply to situations where *both* the negligent act complained of and the accrual of the cause of action took place prior to July 1, 1976. According to plaintiff, this was done so that causes of action which had not already *accrued* would still have the two-year period of limitation from the date the fact of injury was reasonably ascertainable as provided under the old statute.

The district court disposed of this issue by holding that section K.S.A. 60-513(*d*) was applicable to and barred the plaintiff's cause of action. In its well-written memorandum opinion, the district court reasoned as follows:

"Defendants tax plaintiff with trying to change a critical term in paragraph (d) by saying that the limitation of (d) upon actions for injuries resulting from acts taking place prior to the effective date of the statute applies only to the causes which *accrued* (the injury was discovered) prior to the effective date, when in fact the statute speaks of acts *occurring* prior to the effective date. It appears that the point may be settled by reference to the language of the statute. The provisions of the statute which controlled prior to the effective date of the amendment (the limitation of ten years regardless of date of discovery) remained applicable for a period of two years from the effective date of the amendment with respect to any act upon which a cause is predicated which occurred prior to that effective date. 'With respect to any act,' clearly means that the date to be used for calculation of the period of grace is the date of the act causing the injury and not the date of accrual upon ascertainment of injury. If plaintiff had a cause not accrued and thus not barred at the time of the effective date of the act, she could have the benefit of the longer period for two years beyond the effective date of the act, but then the period of grace expired. If the act giving rise to the cause of action (the negligence) occurred on any date within ten years of July 1, 1978, she could institute her action under the prior limitation, but once the grace period passed, the absolute limit of four years applied.

"Two Kansas cases have considered the ten year limitation provision of which plaintiff claims the benefit, and the opinions in those cases are of some assistance in considering the application of the proper limitation here, particularly when the amendment of 1976 is considered in light of what was said by the court in those cases.

"In *Hecht vs. First National Bank & Trust Co.,* 208 Kan. 84, [490 P.2d 649,] decided in 1971, a suit for malpractice was brought as a result of radiation burns received by plaintiff in x-ray therapy. A motion for summary judgment by the defendant physicians on the ground that the action was barred by the two year

statute of limitations was sustained. The trial court found that the fact of the injury was ascertainable to plaintiff more than two years prior to the filing of the petition. On appeal, the Supreme Court held that the section of K.S.A. 60-513 which is now paragraph (b) was applicable but that the date when plaintiff could have reasonably ascertained that she had suffered injury was the subject of a good faith dispute and thus summary judgment was improper. Plaintiff had argued for the adoption of either the continuous-treatment or physician-patient rule under either of which the statute would be tolled so long as treatment of the injury continued. The court held that the statute pre-empted the question by defining specifically the time for commencement of the statutory period:

" 'Under the new provision the period of limitation does not commence until the act giving rise to the cause of action first causes substantial injury, or in the alternative, if the fact of injury is not reasonably ascertainable until sometime after the initial act, then not until the fact of injury becomes reasonably ascertainable to the injured party.' (p. 90.)

"The court described the Kansas statute as a discovery rule with an outside limitation:

" 'The Kansas provision has an outside limitation of ten years, but otherwise is essentially what has been identified as the "discovery rule".' (p. 94.)

"In *Ruthrauff, Administratrix vs. Kensinger*, 214 Kan. 185, [519 P.2d 661,] decided in 1974, the action was for decedent's wrongful death as a result of an explosion and fire destroying a residence built in 1959. The explosion, alleged to be the result of the contractors' negligence in construction, occurred in 1970, and suit was brought within two years thereafter. The defendant contractors prevailed on a motion for summary judgment, the trial court holding that the ten year limitation of K.S.A. 60-513 barred any claim arising as a result of an act occurring more than ten years prior to the filing of suit, concluding that the ten year provision modified the provision of the statute that the cause of action should not be deemed to have accrued until the act first caused substantial injury. The Supreme Court held this to be an erroneous reading of the legislature's intent and that the ten year limitation was applicable only to instances where the injury, having already occurred, did not become reasonably ascertainable within the two year period. It then became a limit upon extension of the two year period, commencing with the act giving rise to the cause of action.

"In holding that the ten year period constituted a limitation on the extension of the primary two year limitation when the injury was not immediately ascertainable, the court noted that if the legislative intent had been to limit the commencement of the action to ten years from the date of the act giving rise to the cause of action, which was the holding of the district court, the legislature could have said so: 'If the legislature intended otherwise it could have clearly expressed itself by saying that in no event shall *an action be commenced* more than 10 years beyond the time of the act giving rise to the cause of action. (p. 191.) As will be remarked hereafter in considering the difference between paragraphs (b) and (c) of the present statute, the legislature did express just such an intent with regard to actions against health care providers, in unmistakably plain language.

"The significance of these decisions applying the ten year extension upon the two year statute of limitations is not the similarity between the ten year provision and the paragraph added to the statute of July 1, 1976, but the significant difference in the way the legislature saw fit to couch the four year limitation.

"The Court has reviewed the record herein and considered the briefs of the parties with the objective of determining whether the defendants have met the burden of establishing that there is no possibility of dispute as to a material fact. The Court has searched for a basis for concluding that there is a possible dispute as to the date when the injury occurred, which, if one followed the language of subparagraph (b), would be the date of accrual of the cause of action. Plaintiff has approached the matter as a question of accrual after discovery, but under subparagraph (b) and the authority of *Hecht, supra,* if the act had not caused substantial injury until sometime after the treatment, the question would be open as to the date of the accrual of the cause of action. While the acts or omissions with regard to insertion of the IUD and examination thereafter took place in 1971, it is not clear from the petition exactly when the injury occurred. The injury appears to have been the embedment of the device in the wall of the uterus at a time obviously later than the insertion by the physician. If that were the situation, and paragraph (b) were the controlling provision, there would be the possibility of a factual dispute which would preclude the entry of summary judgment.

"Paragraph (c) is not, however, simply a replication of paragraph (b) with a shorter period for claiming damages for an undiscovered injury. There are significant differences in the phraseology, and the Court believes the proper conclusion is that they were the result of comments upon paragraph (b) made in *Ruthrauff and Hecht. Ruthrauff* remarks the rule of *Kitchener vs. Williams,* 171 Kan. 540, [236 P.2d 64 (1951),] that, 'tort actions accrue, not when the alleged tortious act is committed, but on the date substantial injuries result therefrom,' which is said to have been consistently followed since its announcement. (p. 189.)

"Paragraph (b) says that the cause of action shall not be deemed to have accrued *until the act giving rise to the cause of action first causes substantial injury,* and it is noted in the opinion in *Ruthrauff* that the statutory provision codifies the rule of *Kitchener.* (p. 190.) The wording of paragraph (c) is materially different. A cause of action for malpractice by a health care provider is deemed to have accrued, not when the act or omission first caused substantial injury, but, 'at the time of the occurrence of the act giving rise to the cause of action.' The statute appears clearly designed to change the rule of *Kitchener,* and since it does so unmistakably, it must be assumed that was the intent of the legislature. The applicable presumption in such a situation is set forth in *Rogers vs. Shanahan,* 221 Kan. 221, [565 P.2d 1384 (1976),] at 225:

" 'It is presumed the legislature had and acted with full knowledge and information as to the subject matter of the statute, as to prior and existing law and legislation on the subject of the statute and as to the judicial decisions with respect to such prior and existing law and legislation.' "

In our judgment, both the result reached and the rationale followed by the district court are legally sound and should be applied. We, therefore, hold that the 1976 amendments to K.S.A. 60-513 are applicable to the plaintiff's cause of action.

The plaintiff's second point on the appeal is that K.S.A. 60-513(*c*) constitutes special legislation in violation of Article 2, Section 17, of the Kansas Constitution. Stated simply, plaintiff's

contention is that the enactment of a separate and shorter statute of limitation for health care providers amounts to special legislation in violation of that section. Article 2, Section 17, as modified and adopted in 1974, provides as follows:

"**Uniform operation of laws of a general nature.** All laws of a general nature shall have a uniform operation throughout the state: *Provided,* The Legislature may designate areas in counties that have become urban in character as 'urban areas' and enact special laws giving to any one or more of such counties or urban areas such powers of local government and consolidation of local government as the Legislature may deem proper."

It is the position of the defendants that Article 2, Section 17, is concerned solely with geographical uniformity in the operation of legislative enactments and has nothing to do with statutory classifications created by the Kansas legislature not involving local laws or government units. It is further the position of the defendants that arbitrary legislative classifications between private citizens, which have the effect of denying equal protection of the laws, are governed exclusively by Sections 1 and 2 of the Bill of Rights of the Kansas Constitution. The issue presented is one that has caused the Kansas Supreme Court much difficulty since the beginning of statehood. In determining the issue, it would be helpful to take a look at the history of Article 2, Section 17, from its original adoption in 1859 to the present time.

The original Section 17 of Article 2 of the Kansas Constitution read as follows:

"§ 17. All laws of a general nature shall have a uniform operation through the State; and in all cases where a general law can be made applicable, no special law shall be enacted."

It should be noted that the original Section 17 consisted of two sentences: (1) All laws of a general nature shall have a uniform operation throughout the state; and (2) in all cases where a general law can be made applicable, no special law shall be enacted. In *Richardson v. Board of Education,* 72 Kan. 629, 84 Pac. 538 (1906), Justice Greene observed that this section distinguishes between "laws of a general nature" and "general laws." He defined a law of a general nature as one whose subject is common to all of the people of the state. General laws are those "which apply to and operate uniformly upon all members of any class of persons, places, or things, requiring legislation peculiar to themselves in the matters covered by the laws." The difference

between a law of a general nature and a general law is that the subject matter of the former must be one common to the people of the entire state, while all that is required of the latter is uniformity of operation. On page 633 of the opinion we find the following language:

"Whether or not the subject of an act which is either general or special in form is one of a general nature is always a question for judicial determination. If the subject-matter is one of a general nature, the rule that it must be governed by a law which shall have uniform operation throughout the state is mandatory. If, however, the subject-matter of the act is one not of a general nature, the law falls under the second subdivision of the constitutional provision, and the question whether it shall be governed by a special or a general law is one that lies wholly within the discretion of the legislature. (*Rambo v. Larrabee,* 67 Kan. 634, 73 Pac. 915.)

"The confusion which has arisen in the decisions of this court upon questions arising under this section of the constitution has grown largely out of the fact that no attempt was made to distinguish between those statutes whose subject-matter was of a general nature and those whose subject-matter was not of a general nature, and the absence of an attempt to distinguish between 'general laws' and 'laws of a general nature.' In all these cases the statutes under consideration were special, and their subject-matter was not of a general nature; hence, it was correctly held that the legislature was the exclusive judge as to whether its object might be attained by a law general in form or by a special law. These cases were all collected, and the apparent conflict reconciled, by the late Justice Cunningham in *Rambo v. Larrabee,* 67 Kan. 634, cited above."

It is thus obvious that, as originally written, Article 2, Section 17, contained two restrictions on legislative action. The first was that laws of a general nature which affect the people of the state generally or in which the people generally have an interest must have a uniform operation throughout the state. The second concerned the subject of special and general legislation. The question of whether a particular subject should be governed by a special or general law was an issue which the Supreme Court in its early years left wholly to the discretion of the legislature. This is discussed in depth in *Rambo v. Larrabee,* 67 Kan. 634, 73 Pac. 915 (1903). It is clear from a reading of the cases that leaving the question to the legislature exclusively, without challenge from the judiciary, caused much disagreement. Some of the members of the legislature felt rather strongly that it was the responsibility of the Supreme Court to keep the legislature within the constitutional restriction imposed by the second sentence of Article 2, Section 17. See for example the discussion in *Anderson v. Cloud County,* 77 Kan. 721, 95 Pac. 583 (1908), particularly at pages 724 through 730. Apparently as a result of popular demand, Article 2,

Section 17, was amended by the people at the general election held in November of 1906. The 1906 version of Article 2, Section 17, was as follows:

"§ 17. Uniform operation of laws of a general nature; special laws. All laws of a general nature shall have a uniform operation throughout the state; and in all cases where a general law can be made applicable, no special law shall be enacted; *and whether or not a law enacted is repugnant to this provision of the constitution shall be construed and determined by the courts of the state.*" G.S. 1949, pp. li, lii. (Emphasis supplied.)

The only change to the original Section 17 was to add the final sentence which made it clear that it was up to the courts to assume the responsibility of determining whether or not a legislative enactment was in violation of this constitutional provision. That amendment of 1906 resolved the preexisting controversy as to whether the legislature or the court had the final authority to determine whether special legislation was permissible in a particular case. It is important to note that the 1906 version of Article 2, Section 17, contained the two distinct provisions which the original section contained. In the opinion in *Anderson v. Cloud County,* 77 Kan. at 730-32, Justice Porter discusses the inherent vice of special laws which *confer special favors on municipal corporations* and *grant special privileges to certain individuals.* Under the 1906 version of Article 2, Section 17, a multitude of cases were presented to the Supreme Court involving the special legislation prohibition. The great bulk of these cases concerned local laws favoring local governmental units. However, there were a number of cases applying Article 2, Section 17, to statutes not specifically affecting local governments where only challenged classifications between individuals were involved. See for example, *Wagner v. Mahaffey,* 195 Kan. 586, 408 P.2d 602 (1965); *Boyer v. Ferguson,* 192 Kan. 607, 389 P.2d 775 (1964); *State, ex rel., v. Consumers Warehouse Market,* 185 Kan. 363, 343 P.2d 234 (1959); *Craig v. Craig,* 143 Kan. 624, 629, 56 P.2d 464 (1936); *In re Williams,* 79 Kan. 212, 98 Pac. 777 (1908).

Section 17 was further amended at the general election of 1954 to read as follows:

" '§ 17. Uniform operation of laws of a general nature; special laws, urban areas. All laws of a general nature shall have a uniform operation throughout the state; and in all cases where a general law can be made applicable, no special law shall be enacted; and whether or not a law enacted is repugnant to this provision of the constitution shall be construed and determined by the courts of the state:

*Provided,* The legislature may designate areas in counties that have become urban in character as "urban areas" and enact special laws giving to such counties or urban areas such powers of local government and consolidation of local government as the legislature may deem proper.'" (Constitutions Volume, p. 61.)

The only change was to add the proviso to permit the legislature to distinguish between urban and nonurban areas, and to enact special laws pertaining to urban areas.

Article 2, Section 17, in its present form, was revised and adopted by the people at the general election of 1974. It now provides as set forth above at the beginning of the discussion on this point. It is important to note that the 1974 amendment of Article 2, Section 17, has completely eliminated the second sentence which provided that "in all cases where a general law can be made applicable, no special law shall be enacted." It is thus to be emphasized that Article 2, Section 17, of the Kansas Constitution as of 1981, simply requires that all laws of a general nature shall have a uniform operation throughout the state. The effect of this change is that the only prohibition contained in Article 2, Section 17, relates to laws of a general nature which affect the people of the state generally. Such laws must apply uniformly throughout the state and thus be *geographically* uniform. We, therefore, hold that Article 2, Section 17, of the Kansas Constitution as it exists today is not applicable to constitutional challenges based upon a denial of equal protection of the laws not involving a claim of lack of geographical uniformity. We further hold that K.S.A. 60-513(*c*) does not violate Article 2, Section 17, of the Kansas Constitution because that statute operates with geographical uniformity throughout the state.

Plaintiff's third point on the appeal is that K.S.A. 60-513(*c*) violates the equal protection clause of the Fourteenth Amendment to the United States Constitution and Sections 1 and 2 of the Kansas Bill of Rights. The plaintiff maintains that a statute which provides a shorter period of limitations for actions in tort against health care providers creates a classification which is arbitrary, discriminatory, and has no rational basis and, as such, is unconstitutional. Where a constitutional equal protection argument is asserted, the Kansas Constitution's counterpart of the Fourteenth Amendment is Sections 1 and 2 of our Bill of Rights. *Manzanares v. Bell,* 214 Kan. 589, 610, 522 P.2d 1291 (1974); *Henry v. Bauder,* 213 Kan. 751, 518 P.2d 362 (1974). Sections 1 and 2 of the Bill of Rights of the Kansas Constitution provide as follows:

"§ 1. **Equal rights.** All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness." (Constitutions Volume, p. 14.)

"§ 2. **Political power; privileges.** All political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit. No special privileges or immunities shall ever be granted by the legislature, which may not be altered, revoked or repealed by the same body; and this power shall be exercised by no other tribunal or agency." (Constitutions Volume, p. 17.)

Section 2 of the Kansas Bill of Rights has been construed as referring solely to *political* privileges and not to those relating to property rights. *State, ex rel., v. Urban Renewal Agency of Kansas City,* 179 Kan. 435, 439, 296 P.2d 656 (1956); *Johnson v. Reno County Comm'rs,* 147 Kan. 211, 225, 75 P.2d 849 (1938); *O'Neal v. Harrison,* 96 Kan. 339, 340, 150 Pac. 551 (1915); and *State v. Durein,* 70 Kan. 13, 18, 19, 80 Pac. 987 (1904). Here a claim of denial of equal protection is raised involving personal or property rights of an individual, not political rights. Hence, the proper constitutional section to be considered is Section 1 of the Kansas Bill of Rights.

In *Armstrong v. Cities Service Gas Co.,* 210 Kan. 298, 312-13, 502 P.2d 672 (1972), the general rules followed in Kansas for determining the constitutionality of a statute of limitations are set forth in the following language:

"The general rule respecting constitutionality of statutes of limitations is stated in 53 C.J.S., Limitations of Actions, § 2, as follows:

" 'The legislature has power to enact statutes of limitation; it may enact a statute which limits the time within which actions may be brought to enforce demands where previously there was no period of limitation or it may change the existing statute of limitations. It may prescribe different periods of time within which different species of obligations may be enforced. Such statutes have usually been sustained as against various particular objections.

" 'As to existing causes of action, a statute of limitations must afford a reasonable time for the commencement of an action before the bar takes effect. If the statute operates immediately to cut off the existing remedy, or within so short a time as to give the party no reasonable opportunity to exercise his remedy, then the retroactive application of it is unconstitutional as to such party. The time allowed cannot be pronounced unreasonable unless it is so short as under the circumstances to amount to a practical denial of the right itself.' (pp. 906-907.)

"Kansas has adhered to the foregoing in many decisions (see e.g., *State, ex rel., v. Board of Education,* 137 Kan. 451, 21 P.2d 295; *In re Estate of Reed,* 157 Kan. 602, 142 P.2d 824.)

"In *Reed* the following appears:

" 'A statute of limitation affects the remedy only, does not impair rights and

obligations, and the legislature has power to enact a statute placing a limitation as to time for the filing of an application for admission of a will to probate, even though a prior statute fixed a different limitation, so long as a reasonable time is given for the commencement of a proceeding for that purpose before the bar of the new statute takes effect.' (Syl. ¶ 4.)"

In *Elam v. Bruenger,* 165 Kan. 31, 40, 193 P.2d 225 (1948), it was held that it is within the power and competency of the legislature to provide for different periods of limitation for different actions where the classification is not unreasonable or discriminatory. In *State ex rel. Schneider v. Liggett,* 223 Kan. 610, 576 P.2d 221 (1978), the issue before the court was the constitutionality of the Kansas Health Care Provider Insurance Availability Act which was one portion of the package of medical malpractice legislation enacted by the 1976 legislature. The statute of limitations in issue in this case was a part of that package. In *Liggett,* it is stated that the test to be applied in determining whether a statute offends the equal protection clause is the "reasonable basis" test. At page 616 of the opinion the following language is used:

"Our next concern is whether the statute offends the equal protection clause. When considering this question we must first determine the proper test. Traditionally, the yardstick for measuring equal protection arguments has been the 'reasonable basis' test. The standard was set forth in *McGowan v. Maryland,* 366 U.S. 420, 425-26, 6 L.Ed.2d 393, 81 S.Ct. 1101:

" '. . . The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it. . . .'

"In *Dandridge v. Williams,* 397 U.S. 471, 25 L.Ed.2d 491, 90 S.Ct. 1153, reh. denied 398 U.S. 914, 26 L.Ed.2d 80, 90 S.Ct. 1684, it was stated:

" '. . . If the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78. . . .' (p. 485.)

"A statute comes before the court cloaked in a presumption of constitutionality and it is the duty of the one attacking the statute to sustain the burden of proof. (*Henry v. Bauder,* 213 Kan. 751, 753, 518 P.2d 362; *Tri-State Hotel Co. v. Londerholm,* 195 Kan. 748, 760, 408 P.2d 877; *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78-79, 55 L.Ed. 369, 31 S.Ct. 337.)"

In the case now before us, plaintiff does not contest the applicability of the "reasonable basis" test to determine the equal protection question presented. Plaintiff questions, however, the

reasonableness of the differentiation between the four-year limitation period for "health care providers" as compared with the ten-year limitation period for other tortfeasors. Plaintiff contends that the classification is arbitrary and unreasonable. We have concluded from a study of the legislative history of the medical malpractice legislation enacted in the 1976 session that the amendments to K.S.A. 60-513 satisfy the requirements of the "reasonable basis" test and that the classification distinguishing health care providers from other persons in respect to the statute of limitations bears a rational relation to the purpose of the health care legislation enacted in 1976. Stated in another way, we find there is a reasonable relation existing between the legislative objective of assuring continued quality health care in this state and the amendment of K.S.A. 60-513 to shorten the statute of limitations to four years for tort actions brought against health care providers. K.S.A. 60-513, as amended in 1976, does not violate equal protection guarantees.

The 1976 amendment to K.S.A. 60-513 was the legislature's attempt to assure continued quality health care for Kansans by combating the rapidly rising cost of medical malpractice insurance and the increasing reluctance of insurance underwriters to underwrite medical professionals. One of the principal causes of the increased costs and unavailability of medical malpractice insurance was attributed to the "long tail," or the length of time after the negligent conduct, allowed for the discovery of the injury and the filing of suit thereon. Medical malpractice insurance policies insure against liability arising from conduct while the policy is in effect. Because of the "long tail," or ten-year discovery period, under the prior statute, premiums were being calculated to include the possibility of claims on policies in effect up to ten years earlier. With the increased number of medical malpractice claims being filed, underwriting malpractice policies became unprofitable, with underwriters leaving the medical malpractice market. As a result, it was feared that doctors would be unable to procure insurance, or would be unwilling to pay exorbitant premiums, and would leave to practice outside of this state. Reduction of the discovery period was considered to be the obvious compromise to assure continued availability of malpractice insurance while protecting the injured parties' causes of action. The public interest in solving the medical malpractice

problem is discussed in depth in *State ex rel. Schneider v. Liggett,* 223 Kan. 610. That discussion shows clearly that there is a reasonable basis for dealing with malpractice actions against health care providers in a different manner than in cases involving other tortfeasors.

Virtually every other jurisdiction considering special medical malpractice statutes of limitations have upheld them against constitutional challenges. As noted previously, such statutes have been upheld when challenged as prohibited "special legislation." *Ross v. Kansas City Gen. Hosp. & Medical Ctr.,* 608 S.W.2d 397 (Mo. 1980); *Anderson v. Wagner,* 79 Ill. 2d 295, 37 Ill. Dec. 558, 402 N.E.2d 560 (1979); *Duffy v. King Chiropractic Clinic,* 17 Wash. App. 693, 565 P.2d 435 (1977). Similar statutes have been upheld when the shorter limitation period expired before the discovery of the injury and it was argued that the statute, therefore, violated state constitutional provisions protecting the right to recover damages for injuries. *Landgraff v. Wagner,* 26 Ariz. App. 49, 54, 546 P.2d 26, *appeal dismissed* 429 U.S. 806 (1976); *Dunn v. St. Francis Hosp., Inc.,* 401 A.2d 77 (Del. 1979) (no violation unless the limitation period is so short as to extinguish the right). These statutes have been upheld against equal protection challenges because of their uniform application to all members within the class, *Landgraff v. Wagner,* 26 Ariz. App. at 55; *Laughlin v. Forgrave,* 432 S.W.2d 308 (Mo. 1968); *Botzet v. Spencer,* 362 F. Supp. 177 (D. Minn. 1973), because the classification was reasonable, *Chaffin v. Nicosia,* 261 Ind. 698, 310 N.E.2d 867 (1974), and reasonably related to the objective sought, *McCarty v. Goldstein,* 151 Colo. 154, 376 P.2d 691 (1962). Some cases have found the shortened limitations period applicable to health care providers to be justified by the medical malpractice insurance crisis. *Landgraff v. Wagner,* 26 Ariz. App. 49; *Anderson v. Wagner,* 79 Ill. 2d 295.

The courts recognize that statutes of limitations are matters of legislative prerogative, carrying the presumption of constitutional validity unless shown to be unreasonable and arbitrary. *Sellers v. Edwards,* 289 Ala. 2, 6, 265 So. 2d 438 (1972); *Owen v. Wilson,* 260 Ark. 21, 537 S.W.2d 543 (1976). The courts have acknowledged that the limitation can be harsh and inequitable in certain circumstances, particularly where the statute of limitations expires before the injury can be discovered. As stated in

*Schwartz v. Heyden Chem. Corp.,* 12 N.Y.2d 212, 237 N.Y.S.2d 714, 188 N.E.2d 142, *amended on other grounds* 12 N.Y.2d 1073, *cert. denied* 374 U.S. 808 (1963):

"[P]erhaps the possibility of feigned cases against unprepared defendants and the difficulties of proof in meritorious cases led to a decision that society is best served by complete repose after a certain number of years even at the sacrifice of a few unfortunate cases." p. 218.

In *Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 89 L.Ed. 1628, 65 S.Ct. 1137 (1945), it was explained:

"Statutes of limitation find their justification in necessity and convenience rather than in logic. They represent expedients, rather than principles. They are practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost. *Order of Railroad Telegraphers v. Railway Express Agency,* 321 U.S. 342, 349. They are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the avoidable and unavoidable delay. They have come into the law not through the judicial process but through legislation. They represent a public policy about the privilege to litigate. Their shelter has never been regarded as what now is called a 'fundamental' right or what used to be called a 'natural' right of the individual. He may, of course, have the protection of the policy while it exists, but the history of pleas of limitation shows them to be good only by legislative grace and to be subject to a relatively large degree of legislative control." p. 314.

The effect of the statute of limitations requires an unfortunate result in the present case, especially since plaintiff's injury was not ascertainable before the statute extinguished her right to bring the action, and her suit would have been timely had the amended statute not intervened. It is clear, however, that the legislature has the authority to set statutes of limitation, that the classification of "health care providers" for beneficial treatment is justified and reasonable, and without constitutional infirmity.

The judgment of the district court is affirmed.

HERD, J., dissenting: We stated in *Elam v. Bruenger,* 165 Kan. 31, 40, 193 P.2d 225 (1948), the legislature has the power to provide different statutes of limitations for different actions providing the classification is not unreasonable or discriminating. I think the classification in the Kansas Health Care Provider Insurance Availability Act is both unreasonable and discriminatory. It is unreasonable to permit negligent health care providers to escape liability for their negligent acts if undiscovered within

four years while the period of discovery is ten years for all other tortfeasors. A negligent health care provider is in a better position to hide his negligence for long periods of time than are other tortfeasors. Health care providers are concerned with a person's most precious possession: life and health. They should, therefore, be held to the highest standard of care. This act diminishes that standard of care.

We now know the propaganda campaign mounted to obtain the legislation was overstated. The so-called crisis in availability of malpractice insurance did not exist and the reduction in discovery time for this one classification of tortfeasor is unjustified. I would reverse.