Christopher **COBURN, a minor, By and Through Royce COBURN and Leslie Coburn, his father and mother, natural guardians and next friends, Plaintiff,**

v.

**Conrado AGUSTIN, M.D., Defendant.**

**Civ. A. No. 80–1520.**

United States District Court, D. Kansas.

Nov. 25, 1985.

Andrew W. Hutton, Michaud, Cordry & Michaud, Hutton & Hutton, Wichita, Kan., for plaintiff.

Darrell D. Kellogg, Wichita, Kan., for defendant.

## OPINION

THEIS, District Judge.

This is an action for medical malpractice in which the minor plaintiff claims he sus-

tained permanent brain damage and other serious injuries as a result of the defendant doctor's negligence. Defendant's requested instruction number 59 would have informed the jury that it could consider collateral source payments to the plaintiff in mitigation of the plaintiff's damages. The proposed instruction tracked the language of the Kansas Medical Malpractice Statute, effective July 1, 1985, which abrogates the collateral source rule in medical malpractice actions. 1985 Kan.Sess.Laws 197. On September 26, 1985, the Court denied the requested instruction and held the new Kansas statute unconstitutional as violative of equal protection. In the following opinion, the Court explains the reasons for its bench ruling.

## I. THE COLLATERAL SOURCE RULE IN KANSAS

■ The collateral source rule generally provides that damages recoverable by a plaintiff for personal injuries may not be reduced by the amount of payments or services received from sources independent of the tortfeasor. *See* J. Dobbs, *Handbook on the Law of Damages* § 8.10 (1973). Kansas has long applied this doctrine. *Southard v. Lira,* 212 Kan. 763, 512 P.2d 409 (1973); *Rexroad v. Kansas Power & Light Co.,* 192 Kan. 343, 388 P.2d 832 (1963); *Lewark v. Parkinson,* 73 Kan. 553, 85 P. 601 (1906).

In 1976, as a part of its response to what was perceived to be a crisis in medical malpractice, the Kansas Legislature enacted K.S.A. § 60–471, which modified the collateral source rule as follows:

(a) In any action for damages for personal injuries or death arising out of the rendering of or the failure to render professional services by any health care provider, evidence of any reimbursement or indemnification received by a party for damages sustained from such injury or death, excluding payments from insurance paid for in whole or in part by such party or his or her employer, and services provided by a health maintenance organization to treat any such injury, ex-

cluding services paid for in whole or in part by such party or his or her employer, shall be admissible for consideration by the trier of fact subject to the provisions of subsection (b). Such evidence shall be accorded such weight as the trier of fact shall choose to ascribe to that evidence in determining the amount of damages to be awarded to such party.

Judge Richard Rogers upheld this statute in the face of equal protection challenges in *Holman v. The Menninger Foundation,* No. 79–4090 (D.Kan., *unpublished,* July 13, 1982), and *Marlatt v. Hutton,* No. 76–46–C5 (D.Kan., *unpublished,* April 3, 1979). In *Doran v. Priddy,* 534 F.Supp. 30 (D.Kan.1981), this Court declared K.S.A. § 60–471 unconstitutional, reasoning that the abolition of the collateral source rule for a single class of tort defendants—health care providers—violated the equal protection clauses of the United States and Kansas Constitutions. In addition, this Court determined that the statute fostered inequitable results by discriminating between patients whose collateral source was insurance and those whose collateral source was services rendered gratuitously. *Id.* at 38. On June 21, 1985, the Kansas Supreme Court evaluated an equal protection challenge to K.S.A. § 60–471, agreed with this Court's analysis and conclusion and struck down the statute as unconstitutional. *Wentling v. Medical Anesthesia Services,* 237 Kan. 503, 701 P.2d 939 (1985).

Effective July 1, 1985, the Kansas Legislature repealed K.S.A. § 60–471 and enacted the following statute in its place:

(3)(a) In any medical malpractice action, evidence of the amount of reimbursement or indemnification paid or to be paid or for the benefit of a claimant under the following shall be admissible: (1) Medical, disability or other insurance coverage except life insurance coverage; or (2) worker's compensation, military service benefit plan, employment wage continuation plan, social welfare benefit program or other benefit plan or program provided by law.

(b) When evidence of reimbursement or indemnification of a claimant is admitted pursuant to subsection (a), the claimant may present evidence of any amounts paid to secure the right to such reimbursement or indemnification and the extent to which the right to recovery is subject to a lien or subrogation right.

(c) In determining damages in a medical malpractice action, the trier of fact shall consider: (1) The extent to which damages awarded will duplicate reimbursement or indemnification specified in subsection (a); and (2) the extent to which such reimbursement or indemnification is offset by amounts or rights specified in subsection (b).

1985 Kan.Sess.Laws 197. While the Kansas state courts have not addressed the validity of this provision, in an opinion filed August 2, 1985, Judge Patrick Kelly upheld the new collateral source rule statute in the face of an equal protection challenge. *Crowe v. Wigglesworth*, 623 F.Supp. 699 (D.Kan.1985). Judge Kelly noted that "[i]n legislation of the type here at issue, out of the similarly situated group of persons injured by the tortious acts of others, the state has isolated for different treatment those persons injured by the negligent acts or omissions of health care providers." *Id.* at 702. Yet Judge Kelly sustained the legislation under the rational basis test because he determined the legislature could reasonably have concluded that "insofar as the size of medical malpractice verdicts allegedly affects the so-called crisis, an effort to more closely relate those verdicts to the actual loss suffered by plaintiffs would offer the malpractice insurance companies some relief." *Id.* at 705. Although he observed that "blind adherence to this most permissive constitutional standard and the consequent over-indulgence of state legislatures in these matters have been properly criticized as an abdication of judicial responsibility," *id.* at 703, Judge Kelly felt constrained to apply the rational basis test because he viewed the statute in question as "merely a procedural enactment, a rule of evidence...." *Id.* at 704. Because of the substantive operation of the collateral source rule, this Court believes a more searching equal protection inquiry is warranted.

## II. EQUAL PROTECTION—AN EMERGING STANDARD OF REVIEW

The Fourteenth Amendment to the United States Constitution declares that no state shall deny a person equal protection of the law. The Kansas Constitution's counterpart of the Fourteenth Amendment is section 1 of the Kansas Bill of Rights: "All men are possessed of equal and inalienable rights, among which are life, liberty, and the pursuit of happiness." Kansas cases appear to construe the Kansas constitutional provision as being substantially the equivalent of the parallel provision in the United States Constitution. *See, e.g., State ex rel. Schneider v. Liggett*, 223 Kan. 610, 616, 576 P.2d 221 (1978).

The equal protection clause has evolved from what was once considered the "last resort" of constitutional argument, *Buck v. Bell*, 274 U.S. 200, 208, 47 S.Ct. 584, 585, 71 L.Ed. 1000 (1927), into a vital tool for effecting social change. A review of the historical development of the various models and trends of equal protection analysis is crucial to an understanding of this evolution and of the Supreme Court's current treatment of the concept.

### A. *Historic Development of Equal Protection Analysis*

Traditionally, equal protection issues have been decided within a two-tiered analytic framework. *United States v. Carolene Products Co.*, 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 783–84, 82 L.Ed. 1234 (1938). The first tier involves a strict scrutiny test by which courts evaluate statutes that discriminate against suspect classes, *see, e.g., Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (race); *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954) (national origin), or that encroach on fundamental rights, *see, e.g., Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (right to marry); *Shapiro v. Thompson*, 394 U.S.

618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (right to travel); *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (right of political association); *Harper v. Virginia Board of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (right to vote); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (right to free exercise of religion); *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) (right to criminal appeals). Under the strict scrutiny standard, the Supreme Court has required the state to show that the statutory scheme in question was "necessary to promote a *compelling* governmental interest." *Shapiro,* 394 U.S. at 638, 89 S.Ct. at 1333 (emphasis in original). In addition, if the legislation affects fundamental rights, the Court has required the state to have chosen the least restrictive means of achieving the governmental objective. *Dunn v. Blumstein,* 405 U.S. 330, 343, 92 S.Ct. 995, 1003–04, 31 L.Ed.2d 274 (1972).

The second tier involves a "rational basis" test under which legislation that does not involve a fundamental right or a suspect class is evaluated. Under the rational basis standard, "[a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). The legislative classification must be sustained "unless it is 'patently arbitrary' . . . ." *Frontiero v. Richardson,* 411 U.S. 677, 683, 93 S.Ct. 1764, 1768–69, 36 L.Ed.2d 583 (1973) (citations omitted).

In the 1970s, the two-tiered system came under criticism for the rigidity inherent in its two widely variant levels of scrutiny. As Professor Gerald Gunther remarked, strict scrutiny was " 'strict' in theory and fatal in fact," whereas the rational basis test afforded "minimum scrutiny in theory and virtually none in fact." Gunther, *The Supreme Court, 1971 Term—Foreward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv.L.Rev. 1, 8, 17 (1972) [hereinafter cited as Gunther, *In Search of Evolving Doctrine* ]. Not only

was the choice of test outcome-determinative, but the model offered no gradations for rights of intermediate importance. The inflexibility in the two-tiered system led the Supreme Court to develop a heightened level of scrutiny for cases involving discrimination against certain kinds of groups. Thus, the Supreme Court extended an intermediate level of scrutiny to legislative classifications based on alienage, *Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), illegitimacy, *Trimble v. Gordon,* 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977), and gender, *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).

In formulating this intermediate level of scrutiny, the Supreme Court looked for guidance to older precedents. Prior to the era of two-tiered equal protection analysis, the Supreme Court had employed a second, more stringent rational basis test in some instances. In *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 562, 64 L.Ed. 989 (1920), the Court required that a classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." Although the *McGowan* formulation eventually became the traditional rational basis test and the *Royster* "fair and substantial relation" standard fell into disuse, the *Royster* test reemerged in the 1970s as the basis for the intermediate standard of review. Note, *Refining the Methods of Middle-Tier Scrutiny: A New Proposal for Equal Protection,* 61 Tex.L.Rev. 1501, 1507 (1983).

The intermediate level of scrutiny has been subject to various formulations. In *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), the Supreme Court addressed a statute which gave preference to men over women in the appointment of intestate administrators. The Court enunciated the standard for gender cases that the legislative classification "must rest upon some ground of difference having a fair and substantial relation to the object of

the legislation...." *Id.* at 76, 92 S.Ct. at 254. In *Craig,* 429 U.S. at 197, 97 S.Ct. at 457, the Court stated that a gender based classification "must serve important governmental objectives and must be substantially related to the achievement of those objectives." Classifications based on illegitimacy "will survive equal protection scrutiny to the extent they are substantially related to a legitimate state interest." *Mills v. Habluetzel,* 456 U.S. 91, 99, 102 S.Ct. 1549, 1554–55, 71 L.Ed.2d 770 (1982). Some commentators suggest that the differences in the standards applied to those categories in the intermediate scrutiny realm are more than adjectival. See, e.g., Note, *Alternative Models of Equal Protection Analysis: Plyler v. Doe,* 24 B.C.L. Rev. 1363, 1390 (1983) [hereinafter cited as *Alternative Models* ]. Indeed, Justice Marshall has contended that the Supreme Court is moving toward a spectrum or sliding-scale of standards which "comprehends variations in the degree of care with which the Court will scrutinize particular classifications, depending ... on the constitutional and societal importance of the interest adversely affected and the recognized invidiousness of the basis upon which the particular classification is drawn." *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 99, 93 S.Ct. 1278, 1330, 36 L.Ed.2d 16 (1973) (Marshall, J., dissenting). *See also Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 318, 96 S.Ct. 2562, 2569, 49 L.Ed.2d 520 (1976) (Marshall, J., dissenting); *Marshall v. United States,* 414 U.S. 417, 432–33, 94 S.Ct. 700, 709, 38 L.Ed.2d 618 (1974) (Marshall, J., dissenting); *Dandridge v. Williams,* 397 U.S. 471, 519–21, 90 S.Ct. 1153, 1179, 25 L.Ed.2d 491 (1970) (Marshall, J., dissenting). *Compare Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (denial of education to children of aliens reviewed under intermediate scrutiny), *with Cabell v. Chavez-Salido,* 454 U.S. 432, 102 S.Ct. 735, 70 L.Ed.2d 677 (1981) (category premised on alienage judged by rational basis test when a "public function" is involved).

While perhaps the Supreme Court will ultimately arrive at a continuum of equal protection standards, it currently appears to have set itself firmly against the expansion of the intermediate and upper tiers of scrutiny. For example, in *Rodriguez,* 411 U.S. at 33–34, 93 S.Ct. at 1296–97, the Court held that education was not a fundamental interest and stated that before an interest could be deemed fundamental for equal protection purposes, it must be explicitly or implicitly guaranteed in a provision of the Constitution. The Supreme Court has also refused to enlarge the number of suspect classes. *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) (poverty is not a suspect class). In *City of Cleburne v. Cleburne Living Center,* — U.S. —, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), the Supreme Court held that mental retardation was not a "quasi-suspect" classification calling for an intermediate level of scrutiny, although it is unclear whether the Court was rejecting the notion of "quasi-suspect" classes or simply rejecting mental retardation as a status deserving of intermediate scrutiny.

### B. *Recent Trends in Equal Protection Analysis*

Although the Supreme Court has made no moves to broaden the intermediate or strict scrutiny tiers, the most recent equal protection decisions indicate an alteration of the rational basis test. In *Cleburne,* the operator of a group home for the mentally retarded challenged a zoning ordinance that required a special use permit for the proposed home for the retarded. The Court, which concurred unanimously in the result, held the ordinance invalid because "the record does not reveal any rational basis for believing that the [proposed] home would pose any special threat to the city's legitimate interests...." *Id.* at 3259. While the Court disavowed that it was applying any heightened form of scrutiny, Justice Marshall, concurring in part and dissenting in part, observed:

To be sure, the Court does not label its handiwork heightened scrutiny, and perhaps the method employed must hereafter be called "second order" rational ba-

sis review rather than "heightened scrutiny." But however labelled, the rational basis test invoked today is most assuredly not the rational basis test of *Williamson v. Lee Optical*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955), *Allied Stores v. Bowers*, 358 U.S. 522, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959), and their progeny. *Id.* at 3264.

Justice Marshall's concurrence and dissent, in which Justices Brennan and Blackmun joined, delineates the differences between the traditional rational basis test and the test fashioned by the majority. First, the Court stated that the "record" did not support the ordinance's classifications. In his opinion, Justice Marshall points out that "under the traditional standard we do not sift through the record to determine whether policy decisions are squarely supported by a firm factual foundation." *Id.* Second, the Court concluded that the stated legitimate concerns for fire hazards and the serenity of the neighborhood "fail rationally to justify singling out a home such as [the proposed home] for the special use permit, yet imposing no such restrictions on the many other uses freely permitted in the neighborhood." *Id.* at 3260. Yet, under the mere rational basis test, courts do not evaluate the propriety of burdening a particular class, because "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Williamson v. Lee Optical*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed.2d 563 (1955). Third, the Court evaluated the closeness of the fit between the legislative goals and means. Justice Marshall again remarked on the majority's divergence from the traditional rational basis test:

> Finally, the Court further finds it "difficult to believe" that the retarded present different or special hazards than other groups. In normal circumstances, the burden is not on the legislature to convince the Court that the lines it has drawn are sensible; legislation is presumptively constitutional, and a State "is not required to resort to close distinctions or to maintain a precise, scientific

uniformity with reference" to its goals. *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 527, 79 S.Ct. 437, 441, 3 L.Ed.2d 480 (1959)....

*Cleburne*, 105 S.Ct. at 3265.

In setting forth these modifications to the rational basis test, the *Cleburne* decision is neither aberrational nor unheralded. A companion case shows that *Cleburne* is not exceptional. In *Metropolitan Life Insurance Co. v. Ward*, —— U.S. ——, 105 S.Ct. 1676, 84 L.Ed.2d 757 (1985), the Supreme Court also used the rational basis test to strike down economic or social welfare legislation. The *Ward* Court held that an Alabama statute that imposed a substantially lower gross premiums tax rate on domestic insurance companies than on out-of-state insurance companies violated the equal protection clause. The Court focused on the relation between the ends of the legislation—promoting a domestic insurance industry—and the means—discriminatory taxation. Moreover, the Court examined the legitimacy of the asserted state purpose. *Id.* at 1684. In tandem, *Cleburne* and *Ward* convincingly demonstrate the Supreme Court's implementation of a more exacting rational basis test.

Earlier cases show that *Cleburne* is not unanticipated. Decisions from several past terms indicate that the Supreme Court has applied some form of elevated scrutiny to cases involving important but not fundamental rights, albeit under the rubric of the rational basis test. For example, in *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), the Supreme Court invalidated a law forbidding distribution of contraceptives to unmarried persons for the purpose of preventing pregnancy. Although one conceivable purpose of the statute was the prevention of premarital, as opposed to extramarital, sexual relations, *see id.* at 448, 92 S.Ct. at 1035–36, the Court determined that this was not *in fact* the legislative intent. *Id.* The statute was struck down as underinclusive, overbroad, and without a rational basis. As Professor John Nowak commented, "The Court exceeded the conceivable basis standard by

scrutinizing the state's asserted interests, the means selected to advance those interests, and the factual connection between the state's classification and the end." Nowak, *Realigning the Standards of Review Under the Equal Protection Guarantee— Prohibited, Neutral and Permissive Classifications,* 62 Geo.L.J. 1071, 1101 (1974) [hereinafter cited as Nowak, *Realigning the Standards of Review* ].

Likewise, in *United States Department of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973), the Supreme Court purported to apply rational basis scrutiny to a law that denied food stamps to any household that contained a person not related to the other members of the household. Although the government asserted that the rule helped prevent fraud and abuse of the food stamp program, the Court looked at the "practical operation" of the statute and held that the "classification here in issue is not only 'imprecise,' it is wholly without any rational basis." *Id.* at 539, 93 S.Ct. at 2828.

Thus, despite avowals that it was applying the traditional rational basis test, in a number of instances the Court has exercised apparently heightened scrutiny. The *Cleburne* and *Ward* decisions of the past term announce a distinct departure from the traditional rational basis test. The rational basis test is now being applied in a manner that is not outcome-determinative. Apparently, the Supreme Court is recognizing that not all cases involving economic and social welfare legislation can be made to fit into the traditional rational basis test and still comport with fundamental fairness under the equal protection clause. While it is true that the Supreme Court has not officially articulated a new test, and while it is unclear whether the old rational basis test has been supplemented or supplanted, the resolution of these issues is unimportant to the question before this Court in the instant case. What is important is to determine, through careful application of a principled analytical framework, which level of scrutiny is to be applied to the statutory scheme presently before the Court.

## C. *Rational Basis and Heightened Rational Basis Scrutiny*

The traditional rational basis test that was applied to most economic and social welfare legislation upheld a statutory classification if it rested on grounds not "wholly irrelevant" to the achievement of the state's objective. *McGowan,* 366 U.S. at 426, 81 S.Ct. at 1105. Legislation was presumed to be valid and would be sustained if "any set of facts reasonably may be conceived to justify" the statutory discrimination. *Id.* Courts would honor legislative judgments on the question of classification as long as those judgments were not "patently arbitrary." *Frontiero,* 411 U.S. at 683, 93 S.Ct. at 1768–69.

The Supreme Court is now applying the rational basis test more stringently than in the past. Under the *Cleburne* formulation of the rational basis test, there is no place for judicial imagination or hypothesizing about possible legislative purposes. *See also Weinberger v. Wiesenfeld,* 420 U.S. 636, 648, 95 S.Ct. 1225, 1233, 43 L.Ed.2d 514 (1975) ("[T]he mere recitation of a benign ... [statutory] purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme."). The question is whether the legislative classification is *in fact* related to the object of the statute. *See Cleburne,* 105 S.Ct. at 3259–60; *James v. Strange,* 407 U.S. 128, 140–41, 92 S.Ct. 2027, 2023–24, 32 L.Ed.2d 600 (1972); *Eisenstadt,* 405 U.S. at 446–55, 92 S.Ct. at 1034–39. Furthermore, a court's genuine inquiry may test the rationality of the classification. In their concurrence in *Cleburne,* 105 S.Ct. at 3261, Justices Stevens and Burger suggested that the boundaries of "rational" behavior may be circumscribed by an evaluation that measures the benefits and burdens of the legislation:

The term "rational," of course, includes a requirement that an impartial lawmaker could logically believe that the classification would serve a legitimate public purpose that transcends the harm to the

members of the disadvantaged class. Thus, the word "rational" ... includes elements of legitimacy and neutrality that must always characterize the performance of the sovereign's duty to govern impartially.

To determine whether a statute is rational, a court must consider the law's logical tendency to promote its stated goals as against its tendency to impair other, more important, goals. *See Bell v. Hongisto,* 501 F.2d 346, 355 n. 12 (9th Cir.1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975). The evaluation of rationality necessarily involves some inquiry into the correspondence between the legislative goals and means. Heightened scrutiny within the framework of the rational basis test therefore requires a balancing of state interests and personal rights. *See Cleburne,* 105 S.Ct. at 3260. A court must examine the nature of the class burdened, the importance of the rights affected, and the extent to which they are impaired, and must balance these considerations against the significance of the governmental interest. *See Weber v. Aetna Casualty & Surety Co.,* 406 U.S. 164, 173, 92 S.Ct. 1400, 1405–06, 31 L.Ed.2d 768 (1972). While it may be suggested that balancing provokes an exercise in visceral jurisprudence, it should be recognized that courts must always make substantive value choices in the area of equal protection.

In circumstances where a right is particularly important or a class is particularly in need of protection, heightened scrutiny under the rational basis test appears to be required. While a majority of the Supreme Court has not explicitly recognized the existence of "sensitive" classes, the decision to apply a heightened form of scrutiny to classifications based on alienage, gender and illegitimacy is sensible only if the goals of equal protection are conceived to be targeted toward classes displaying certain distinguishing characteristics. A number of commentators have advocated recognition of "sensitive" classifications which trigger some heightened form of scrutiny. *See, e.g.,* G. Gunther, *Constitutional Law* 862 (10th ed. 1980). Professor Lawrence Tribe has suggested that "[w]hether or not the groups in question might qualify for treatment as 'discrete and insular' minorities, they bear enough resemblance to such minorities to warrant more than a casual judicial response when they are injured by law." L. Tribe, *American Constitutional Law* 1090 (1978). From the recent decision in *Cleburne,* it is apparent that the rational basis test will be used to safeguard those prized rights not deemed fundamental and to protect those disadvantaged and powerless classes not deemed suspect.

While it is clear that the level of scrutiny increases with the importance of the rights involved and the sensitivity of the classifications invoked, *Plyler,* 457 U.S. at 221–22, 102 S.Ct. at 2397, it would be injudicious for this Court to attempt to predict precisely when heightened scrutiny under the rational basis test is triggered. Determining the standard of review according to the nature of the classifications and the rights involved does not require courts to make fantastic or unprincipled leaps of logic. The ingredients of analysis are much the same as those employed in the race, sex, alienage or right to travel cases. The application of heightened scrutiny under the rational basis test will need to evolve on a case-by-case basis, as courts delineate important rights and sensitive classes. The task before this Court is to determine whether heightened scrutiny under the rational basis test must be employed in assessing the legislation involved in this case.

## III. APPLICATION OF HEIGHTENED SCRUTINY UNDER THE RATIONAL BASIS TEST

While only the collateral source rule provisions of the new medical malpractice legislation are properly before the Court, the following analysis applies with equal force to the remainder of the statute. Defendant's trial brief regarding the collateral source statute urges this Court to apply the mere rational basis test in the instant case. The Court recognizes that in many

jurisdictions various types of medical malpractice enactments have been upheld under the traditional rational basis test. *Hoffman v. United States,* 767 F.2d 1431 (9th Cir.1985) (recovery limitations); *Fitz v. Dolyak,* 712 F.2d 330 (8th Cir.1983) (statute of limitations); *Seoane v. Pharmaceuticals, Inc.,* 660 F.2d 146 (5th Cir.1981) (medical review panels); *DiAntonio v. Northampton-Accomack Memorial Hospital,* 628 F.2d 287 (4th Cir.1980) (mediation panel); *Baker v. Vanderbilt University,* 616 F.Supp. 330 (D.Tenn.1985) (collateral source rule); *Houk v. Furman,* 613 F.Supp. 1022 (D.Me.1985) (prelitigation notice requirement); *Reese v. Rankin Fite Memorial Hospital,* 403 So.2d 158 (Ala. 1981); *Eastin v. Broomfield,* 116 Ariz. 576, 570 P.2d 744 (1977); *Simpson v. Fuller,* 281 Ark. 471, 665 S.W.2d 269 (1984); *American Bank and Trust Co. v. Community Hospital of Los Gatos-Saratoga, Inc.,* 36 Cal.3d 359, 204 Cal.Rptr. 671, 683 P.2d 670 (1984); *Lacy v. Green,* 428 A.2d 1171 (Del.Super.1981); *Pinillos v. Cedars of Lebanon Hospital Corp.,* 403 So.2d 365 (Fla.1981); *LePelley v. Grefenson,* 101 Idaho 422, 614 P.2d 962 (1980); *Anderson v. Wagner,* 79 Ill.2d 295, 37 Ill.Dec. 558, 402 N.E.2d 560 (1979); *Johnson v. St. Vincent Hospital, Inc.,* 273 Ind. 374, 404 N.E.2d 585 (1980); *Rudolph v. Iowa Methodist Medical Center,* 293 N.W.2d 550 (Iowa 1980); *Stephens v. Snyder Clinic Association,* 230 Kan. 115, 631 P.2d 222 (1981); *Sibley v. Board of Supervisors of Louisiana State University,* 462 So.2d 149 (La.1985); *Attorney General v. Johnson,* 282 Md. 274, 385 A.2d 57 (1978), *app. dismissed,* 439 U.S. 805, 99 S.Ct. 60, 58 L.Ed.2d 97 (1979); *Paro v. Longwood Hospital,* 373 Mass. 645, 369 N.E.2d 985 (1977); *Linder v. Smith,* 629 P.2d 1187 (Mont.1981); *Prendergast v. Nelson,* 199 Neb. 97, 256 N.W.2d 657 (1977); *Suchit v. Baxt,* 176 N.J.Super. 407, 423 A.2d 670 (1980); *Otero v. Zouhar,* 102 N.M. 493, 697 P.2d 493 (1984); *Comiskey v. Arlen,* 55 A.D.2d 304, 390 N.Y.S.2d 122 (1976); *Beatty v. Akron City Hospital,* 67 Ohio St.2d 483, 424 N.E.2d 586 (1981); *State ex rel. Strykowski v. Wilkie,* 81 Wis.2d 491, 261 N.W.2d 434 (1978). While most of these cases are inapplicable because they do not concern the specific provisions or constitutional issues currently before this Court, all are unhelpful because they applied the mere rational basis test without any consideration of whether heightened scrutiny was required. Since the above courts applied the rigid tripartite test of equal protection while giving little or no thought to its propriety, the Court finds the opinions of scant assistance in evaluating the nature of the interests in the present case.

The decisions are by no means unanimous. In a growing number of cases courts have struck down different types of medical malpractice legislation, some under various heightened forms of scrutiny. *Kenyon v. Hammer,* 142 Ariz. 69, 688 P.2d 961 (1984); *Austin v. Litvak,* 682 P.2d 41 (Colo.1984); *Aldana v. Holub,* 381 So.2d 231 (Fla.1980); *Jones v. State Board of Medicine,* 97 Idaho 859, 555 P.2d 399 (1976); *Wright v. Du Page Hospital Association,* 63 Ill.2d 313, 347 N.E.2d 736 (1976); *McCoy v. Western Baptist Hospital,* 628 S.W.2d 634 (Ky.App.1981); *Sabatini v. Marcuz,* 122 Mich.App. 494, 332 N.W.2d 512 (1983); *Cardinal Glennon Memorial Hospital v. Gaertner,* 583 S.W.2d 107 (Mo.1979); *Carson v. Maurer,* 120 N.H. 925, 424 A.2d 825 (1980); *Hartford Accident & Indemnity Co. v. Ingram,* 290 N.C. 457, 226 S.E.2d 498 (1976); *Arneson v. Olson,* 270 N.W.2d 125 (N.D.1978); *Graley v. Satayatham,* 343 N.E.2d 832 (Ohio Ct.Comm.Pleas 1976); *Mattas v. Thompson,* 491 Pa. 385, 421 A.2d 190 (1980); *Goucher v. Sayeed,* 459 A.2d 87 (R.I.1983); *Sax v. Votteler,* 648 S.W.2d 661 (Tex.1983). Moreover, state statutes abolishing the collateral source rule for health care providers have been variously upheld and struck down as unconstitutional. *Compare Eastin v. Broomfield,* 116 Ariz. 576, 570 P.2d 744 (1977), *with Graley v. Satayatham,* 343 N.E.2d 832 (Ohio Ct.Comm.Pleas 1976).

Finally, the Court does note that an appeal of a California Supreme Court's rejection of equal protection challenges to a California statute imposing a limitation on

damages recoverable for pain, suffering and other non-pecuniary losses in medical malpractice cases was recently dismissed by the United States Supreme Court. *Fein v. Permanente Medical Group*, 38 Cal.3d 137, 211 Cal.Rptr. 368, 695 P.2d 665 (1985), *app. dismissed*, —— U.S. ——, 106 S.Ct. 214, 88 L.Ed.2d 215 (1985). Apart from the obvious differences between a legislative cap on *noneconomic* damages and an evidentiary rule which operates to limit *actual* damages, this Court discerns a number of distinctions between California and Kansas law, *see, e.g.*, Kansas Bill of Rights § 18, as well as significant factual dissimilarities between *Fein* and the present case. Moreover, the precedential effect of a summary affirmance is open to serious question. The weight of judicial authority suggests that a summary affirmance represents an approval of the judgment below by the Supreme Court but should not be taken as an endorsement of the lower court's reasoning. *Fusari v. Steinberg*, 419 U.S. 379, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975); *Hardwick v. Bowers*, 760 F.2d 1202 (11th Cir.1985).

Against this rather inharmonious background, this Court must select and apply the appropriate equal protection test. With respect to the specific provisions before this Court, the first step is to determine the proper standard of review. The medical malpractice statute establishes several classifications. It confers certain benefits on tortfeasors who are health care providers that are not afforded to other tortfeasors. Conversely, the statute distinguishes between those tort claimants whose injuries were caused by medical malpractice and all other tort claimants, and restricts the means and amounts that the former may recover as damages for injuries. Furthermore, the statute makes a number of internal distinctions between medical malpractice tort claimants on the basis of the types of indemnification or reimbursement to which they are entitled. Finally, doctors are being treated differently than other professional who might also be subject to malpractice actions.

■ None of these statutory demarcations involves the type of suspect classification, such as race, nationality or alienage, that the United States Supreme Court has held requires strict scrutiny. The rights classified as "fundamental" by the Supreme Court have been few in number. *See supra* p. 986. While the Supreme Court has offered little guidance as to the characteristics of a fundamental right, *see San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 33–34, 93 S.Ct. 1278, 1296–97, 36 L.Ed.2d 16 (1973) (fundamental rights are those rights "explicitly or implicitly guaranteed in the Constitution"), it has not expanded the list of fundamental rights beyond privacy, marriage, travel, voting, political association, criminal appeals and religion. *Alternative Models, supra*, at 1372. *See, e.g., Lindsey v. Normet*, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972) (right to housing not fundamental); *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) (right to welfare payments not fundamental). The rights here at issue—to be free from unconsented assaults and to recover damages for personal injuries—are unquestionably important, but they are not fundamental. *Cf. Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). Therefore, the Court determines that strict scrutiny is not appropriate in the instant case.

Intermediate review is also inappropriate. The Supreme Court has used intermediate scrutiny haltingly, and has not extended it to any categories other than gender, *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), alienage, *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), or illegitimacy, *Trimble v. Gordon*, 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977).

To ascertain whether the mere rational basis test or a heightened form of rational basis scrutiny should apply, the Court must examine the nature of the rights involved and the sensitivity of the classifications. The United States Supreme Court has long exhibited an attentiveness to intimate per-

sonal liberties and rights regarding bodily integrity. *See Winston v. Lee,* ── U.S. ──, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). The right to be free from assaults, while not fundamental, is nonetheless vitally important and commanding of special protection:

> The Framers may have considered interests in free speech and expression and freedom of association as particularly susceptible to legislative derogation, and, therefore, in need of explicit Constitutional protection. However, the Framers may have quite reasonably assumed that legislatures would never undervalue or act adversely towards the natural rights of personal security and bodily integrity.... A static Constitution would protect freedom of association against hostile or impulsive laws, but not protect personal autonomy. The Supreme Court logically reformed this incongruity by accomodating rights central to personal control and bodily autonomy. Rights of procreation and privacy were deemed to be implicitly protected in the Constitution. The rights to personal security and bodily integrity, and corresponding rights to relief from invasions thereof, are logically encompassed by this constitutional interpolation.

Learner, *Restrictive Medical Malpractice Compensation Schemes: A Constitutional "Quid Pro Quo" Analysis To Safeguard Individual Liberties,* 18 Harv.J. on Legis. 143, 190–91 (1981) [hereinafter cited as Learner, *"Quid Pro Quo"*]. Victims of medical malpractice—unconsented assaults by health care providers—have long relied on a tort action "as a sufficient safeguard against this invasion of bodily integrity." *Id.* at 192. Therefore, limitations on tort remedies take on added significance in light of their effect on the underlying right of bodily integrity.

Although the right to recover for personal injuries is not a fundamental right, it is nevertheless an important substantive right. *Carson v. Maurer,* 120 N.H. 925,

424 A.2d 825, 830 (1980). Indeed, section 18 of the Kansas Bill of Rights provides: "All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay." The Kansas Supreme Court has employed section 18 to invalidate doctrines that unjustly deny remedies. *See, e.g., Gorrell v. City of Parsons,* 223 Kan. 645, 576 P.2d 616 (1978).

While the rights involved in this case are significant, that alone is not enough to trigger heightened scrutiny. The Court must also examine the sensitivity of the class embraced by the legislation. The traditional indicia of a suspect class are that the class is "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *Rodriguez,* 411 U.S. at 28, 93 S.Ct. at 1296. A number of similar characteristics indicate the existence of a sensitive class: a group that has suffered a history of prejudice, although in a milder form such that the class itself does not qualify as suspect; or a group that has inadequate representation from significant socio-political barriers to interest group formation, *see* Note, *Intermediate Equal Protection Scrutiny of Welfare Laws That Deny Subsistence,* 132 U.Pa.L.Rev. 1547, 1554 (1984); Learner, *"Quid Pro Quo",* supra, at 185; or a classification based on an inherent trait over which the class members have no control, which trait is the subject of the legislation, *see Plyler,* 457 U.S. at 222, 102 S.Ct. at 2397.

■ Medical malpractice victims generally have no control over the inception of their afflictions or illnesses and even less choice concerning the medical mis-, mal- or nonfeasance practiced on them. Moreover, victims of medical malpractice are relegated to a position of political powerlessness:

> [I]t seems highly unlikely that many individuals actively contemplate the relative-

ly remote risk that they may become malpractice victims. The number of actual victims is not large enough to generate widespread public concern for personal safety, nor is notice of the restrictive legislation sufficiently prominent to draw the attention of individuals who may rationally assume that they continue to possess an effective judicial remedy. There is no apparent impetus to trigger the intense concerns that galvanize individuals to coalesce into political organizations that participate actively in the legislative process.

Learner, *"Quid Pro Quo"*, *supra*, at 186. Moreover, once injured, medical malpractice victims may very well lack the physical faculties and financial resources to mount a successful challenge to laws curtailing their rights. Thus, the Court concludes that the classifications involved in this case are sensitive, and that the rights at issue are sufficiently important to require that the restrictions on those rights be subjected to a more exacting form of scrutiny than the mere rational basis test. The Court, therefore, will apply a heightened scrutiny test, requiring an examination of the purposes of the legislation and the rationality of the link between those purposes and the legislation actually enacted, as well as a balancing of the interests served and the interests burdened.

### A. *Purposes of the Legislation*

■ Defendant asserts that the purpose of the new collateral source rule is identical to the purpose for which previous medical malpractice statutes were enacted. Defendant points to *State ex rel. Schneider v. Liggett*, 223 Kan. 610, 616, 576 P.2d 221 (1978), in which the Kansas Supreme Court found that the purpose of a mandatory medical malpractice insurance statute was the assurance of the availability of insurance for health care providers, which in turn would make certain an adequate supply of health care providers, which thereby would assure the continued availability of quality health care for Kansas. Application of this logic to the collateral source rule statute requires the addition of an extra link in the chain of reasoning: that the reduction in damage awards against health care providers will assure the availability of low cost insurance for those providers.

While the Court is willing to follow the somewhat torturous tautology of asserted purpose, the Court must examine the factual nexus between the goal of quality health care and the means of allowing the tortfeasor to have the benefit of insurance privately purchased by or for the tort victim. Numerous courts and commentators have sagely observed that the extending of special litigation benefits to the medical profession will do little to protect the public health. "On the contrary, the quality of health care may actually decline. To the extent that in tort actions of the malpractice type if the medical profession is less accountable than formerly, relaxation of medical standards may occur with the public the victim." *Graley v. Satayatham*, 343 N.E.2d 832, 838 (Ohio Ct.Comm.Pleas 1976). *See also* Comment, *California's Medical Injury Compensation Reform Act: An Equal Protection Challenge*, 52 S.Cal.L.Rev. 829, 854 n. 143 (1979). Indeed, although reaching a different result than this Court, Judge Kelly commented in strong language on the legislation at issue here:

On a more fundamental level, this Court is not at all persuaded that this discriminatory legislation is needed or that it will achieve its stated goals. Regarding need, defendants cavalierly refer to the "obvious" medical malpractice crisis justifying this legislation. What is apparently so clear to the medical profession, the insurance industry, their respective lobbyists, and the Legislature is a matter of deep and growing concern to this Court as well as a number of commentators and other courts across the country. In the Legislature's haste to remedy the situation, it has overlooked or, more likely, ignored the fundamental cause of the so-called crisis: it is the unmistakable result not of excessive verdicts, but of

excessive malpractice by health care providers.

*Crowe v. Wigglesworth*, 623 F.Supp. 699 at 706 (D.Kan.1985).

### B. *Rationality*

Next, the Court must examine the rationality of the classifications involved. While various internal discriminations remain in the new collateral source statute, *see Doran v. Priddy*, 534 F.Supp. 30, 36 (D.Kan. 1981), the Court will target its inquiry on the more invidious divergence of treatment between victims of medical malpractice and all other tort victims. " 'Equal protection' ... emphasizes disparity in treatment by a state between classes of individuals whose situations are arguably indistinguishable." *Ross v. Moffitt*, 417 U.S. 600, 609, 94 S.Ct. 2437, 2443, 41 L.Ed.2d 341 (1974). With respect to the collateral source rule, there is no rational difference between the groups of victims, except that the people disadvantaged by the new legislation were harmed by health care providers—which simply begs the question of the demarcation.

The special consideration given to the medical profession by this statute raises questions about strong class interests. In his dissent in *Stephens v. Snyder Clinic Association*, 230 Kan. 115, 133, 631 P.2d 222 (1981), Justice Herd recognized that "the propaganda campaign mounted to obtain the [medical malpractice] legislation was overstated." While legislation is usually the result of assertions of interests within the political arena, if left unchecked the process would legitimate tyranny by the majority. Equal protection provides the safeguard against pure majoritarianism, since the Constitution may require more than the political process will supply. Other courts have castigated precisely the sort of special interest legislation at work here:

> [T]he state has neither a compelling nor legitimate interest in providing economic relief to one segment of society by depriving those who have been wronged of access to, and remedy by, the judicial system. If such a hypothesis were once

approved, any profession, business or industry experiencing difficulty could be made the beneficiary of special legislation designed to ameliorate its economic adversity by limiting access to the courts by those whom they have damaged. Under such a system, our constitutional guarantees would be gradually eroded, until this state became no more than a playground for the privileged and influential.

*Kenyon v. Hammer*, 142 Ariz. 69, 688 P.2d 961, 976 (1984).

### C. *Balancing*

Finally, the Court must balance the societal interests against the class interests served by the legislation and measure the benefits and burdens of the law. The state goal of lowering malpractice insurance costs must be weighed against the interests of the victims of medical malpractice. While health care provider defendants receive a direct economic benefit, medical malpractice victims lose the ability to obtain full recovery for their injuries, whereas any benefit to the victims and indeed society in terms of improved quality of care is significantly attenuated. A fair reading of a long history of precedents suggests that the constitutional balance should favor the victims. For example, a state can confer benefits upon opthalmologists and optometrists at the expense of an equally organized group, opticians. *Williamson v. Lee Optical*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). However, a state cannot benefit homedwellers at the expense of the mentally retarded. *City of Cleburne v. Cleburne Living Center*, —— U.S. ——, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In this case, a privilege is being created on behalf of doctors and insurance companies, while the class that pays the price is comprised of injured and powerless medical malpractice victims. The restriction of important rights of a disadvantaged class significantly outweighs the benefits sought to be conferred upon the privileged class.

### IV. CONCLUSION

An equal protection review of the medical malpractice statute currently before

this Court demonstrates that the statute significantly impinges upon the important rights of a class without the resources or capacity to protect itself. Moreover, the legislative classifications inure to the benefit of a limited few. Because this Court believes that groups other than those entitled to strict scrutiny merit constitutional protection, the Court applied a heightened form of rational basis scrutiny. The application of heightened rational basis scrutiny convinces the Court that the legislative means of affording health care providers a method of reducing their liability for damages is not sufficiently related to the legislative goal of better health care. Therefore, the Court holds that the new collateral source rule statute violates the equal protection clauses of the United States and Kansas Constitutions.