## CIRCUIT COURT OF FAIRFAX COUNTY

Vivian L. Williams

v.

Harmen Van Der Woude et al.

### December 19, 1986

### Case No. (Law) 70286

### By JUDGE THOMAS A. FORTKORT

Vivian L. Williams is a 34 year old businesswoman afflicted with terminal cancer. Ms. Williams had been treated for a condition known as severe dysplasia by a doctor specializing in gynecology and obstetrics. Severe dysplasia is a condition which develops in females in the cervix area. It is commonly referred to as a precancerous condition, because in many women it is a precurser to cancer of the cervix.

Cervical cancer is a medical anomaly in that with early treatment it is almost 100% curable, and with delayed discovery it is almost always fatal.

Severe dysplasia and cervical cancer both involve abnormal cells in the cervix. Both conditions require action by the physician. In younger women of child bearing age such as Vivian Williams, the treatment of choice is the destruction of the abnormal cells by freezing them in an operation called cryosurgery. In older women a partial or full hysterectomy is the normal treatment.

The procedure for discovery of abnormal cells in the cervix is to scrape the walls of the cervix and place

the scraping material on a slide for examination by a pathologist. The pathologist is able to determine whether the scraped material contains normal, abnormal or cancerous cells. The procedure is normally referred to as the "pap" test after its discoverer, a Greek gynecologist.

Following her cryosurgery, Ms. Williams went to the Alexandria Women's Clinic for her gynecological care, specifically for pap tests. Two pap tests came back from the laboratories with the finding of moderate dysplasia. Ms. Williams was examined by Dr. Van Der Woude in the fall of 1982. At that time she had some symptoms of breakthrough bleeding. On the basis of her past history and her recent pap tests, Dr. Van Der Woude, to meet the Virginia standard of care should have performed or referred Ms. Williams to a doctor for a colposcopy, which provides an enhanced visual examination of the cervix.

The pap tests taken by Dr. Van Der Woude came back as class 3, i.e., severe dysplasia or cancer in situ. The standard of care requires that the patient be contacted and a colposcopy be performed. The clinic did not contact Ms. Williams nor did it take any action upon Ms. Williams's two subsequent returns to the clinic in December 1982 and May 1983.

In April 1984, Ms. Williams was advised that she had cancer and that it had penetrated the cervix. Surgery revealed a large growth and was abandoned as a treatment modality. Radiology and chemotherapy provided a period of remission but the discovery of new tumors has turned Ms. Williams's prognosis to terminal and her present condition is critical.

Each side called several witnesses both as to what notice may or may not have been given to Ms. Williams and several expert medical witnesses testified as to the standard of care. The evidence of the plaintiff supports a finding of negligence against both the clinic and Dr. Van Der Woude. The jury returned a verdict in favor of Ms. Williams against both Dr. Van Der Woude, M.D., and the Alexandria Women's Clinic in the amount of three million dollars. The amount of the recovery exceeds the maximum recovery allowable for malpractice claims as established by Virginia Code § 8.01-581.15.

Three issues arise in connection with this jury verdict.

1. Does the medical malpractice limitation of Section 8.01-581.15 apply to the total recovery or does it limit recovery against each of the medical care providers separately?

2. Does the limitation of seven-hundred and fifty thousand dollars in the April 1, 1977, statute or the limitation of one-million dollars, October 1, 1983, act apply to the facts of this case?

3. Does the enactment of the statutory limitation on recovery in medical malpractice actions meet constitutional requirements?

I. *Does the limitation of 8.01-581.15 apply to total recovery or to each medical care provider?*

The relevant portion of the statute reads in part: "[i]n any verdict against a health care provider in an action for malpractice. . . the total amount recoverable for an injury to, or death of, a patient shall not exceed one million dollars." This case may come under the previous limitation of $750,000, which was increased to $1,000,000 on October 1, 1983. In 1983, the legislature considered but did not adopt an amendment that would have made it clear that the limitation should apply to individual defendants and not to all defendants combined.

The Plaintiff argues that the limitation on recovery for medical malpractice should apply to each health care provider individually, so that where there are multiple defendants the plaintiff could recover an amount up to the limitation from each defendant.

In support of the first claim, the Plaintiff argues that to allow stacking of recoveries would be consistent with the intention of the legislature to limit the exposure of any single health care provider, as evidenced by with the purpose section of the statute; and it would provide for more complete compensation to the injured party. The fact that in 1983 the legislature considered but did not enact an amendment expressly providing for stacking should be viewed as an attempt merely to clarify the existing statute and not to change it; and where there are ambiguous constructions of a statute, the statute must be construed strictly in terms of the existing laws prior to enactment of the statute.

The Defendants, in support of their position that "stacking" should not be allowed, assert that the 1983 proposed amendment was an attempt to change the law and the failure to enact it indicates the legislature's intention that the *total* recovery be subject to the limitation.

The language of the statute gives no indication that stacking should not be permitted. The statute merely limits the "total amount recoverable" in an action "against a health care provider." Defendants argue that this use of the term "total amount" means, in effect, the total amount recoverable in the case against all Defendants together. However, it seems more probable that the term "total amount" was used to emphasize that the limitation is not restricted to recovery for pain and suffering, that the limitation encompasses economic damages as well. On the other hand, the phrase "any verdict against *a* health care provider" (emphasis added) suggests that the limitation is to apply to one health care provider at a time.

Both sides make arguments as to how the court should interpret the handling of the 1983 amendment by the legislature. Little if any conclusion can be drawn from the legislature's failure to address the statute's ambiguity in 1983. Had a court decision been available, under normal statutory construction rules we could consider the legislative inaction as approval of the court decision. Not having that aid we must resort to other statutory construction analysis.

Applying the limitation to each provider would establish a fixed limitation on the risk insured. Each health care provider acquires its own malpractice insurance. If stacking is not permitted, then the maximum liability under any one policy would vary depending upon the number of defendants found jointly liable. The "exposure" for a single provider could still be the full amount of the limitation in a case where there is a single defendant found liable. Allowing stacking provides a fixed maximum liability for any insured regardless of the fortuitous circumstance of the number of codefendants in the case.

Given that the legislative history is ambiguous, the language of the statute itself and the rule of construction cited by the Plaintiff controls. The statute read in light of its goal seeks to protect individual care providers against recoveries of over $750,000. Since the common law would allow total recovery, the court

is required to follow the less restrictive interpretation of this legislation creating an exception to common law recovery.

The United States District Court for the District of Columbia has stated the rule thusly. "Legislation which authorizes action encroaching on constitutional rights must be construed in manner which affords the greatest protection for individual rights and must be assumed that the law makers intended to place no greater restraint on the citizen than was clearly and unmistakably indicated by the language used." *Woodward v. Rogers*, 344 F. Supp. 974 (D. D.C. 1972), *affirmed* 486 F.2d 1317 (D.C. Cir. 1973). Applying this rule to the instant case, the plaintiff may recover up to the limitation against both medical care providers.

II. *Does the one million dollar limitation of October 1, 1983, apply to the case at bar?*

Plaintiff's argument as to whether the limitation of one-million or seven hundred and fifty thousand applies, is as follows.

The first act of negligence by Dr. Van Der Woude occurred in September 1982. From shortly after that date, the clinic and Dr. Van Der Woude had an ongoing obligation to warn the Plaintiff of her pap test results. In May, 1983, the Plaintiff was at the Clinic and again received no warning of her condition. October 1, 1983, was the date of the extension of the limitation to one million dollars. The cancer was discovered in May, 1984.

The negligent acts complained of straddle the limitation increase if you consider that the defendants had an ongoing duty to warn the patient. Further, since cancer in situ is a slow growing disease, Ms. Williams might have still been salvageable with prompt action as late as October 1, 1983, and thereafter. Several expert witnesses including Dr. Van Der Woude stated that the Plaintiff would to a reasonable degree of medical certainty have been curable by May and for some time thereafter.

The statutory language reads as follows:

In any verdict returned against a health care provider in an action for malpractice where

the act or acts of malpractice occurred after October 1, 1983, which is tried by a jury. . . .

Thus, the plaintiff argues since on October 1, 1983, my client may have been able to be cured of her malady, she is entitled to the increased statutory limitation. As has been previously stated, statutes involving constitutional rights must be construed in favor of individual rights.

Nevertheless, it is the opinion of this Court that the lower limit applies. Plaintiff's injury was caused by the failure of Dr. Van Der Woude to conduct a proper examination in September 1982 and his ongoing duty to warn Ms. Williams of her potentially hazardous condition.

The clinic's negligence concerned the lack of file review on the patient's two visits following her class 3 pap smear and its ongoing failure to warn the defendant of her condition.

The duty to warn is not absolute. The defendants' must take reasonable steps to warn a patient of a class 3 pap smear. If the steps taken are not reasonable then the act of negligence occurs. The result, which becomes more dangerous with time, is not material to the negligent act for the purpose of determining when the act occurred. It is similar to any traumatic injury where the date of the accident is known but the ultimate results do not appear for months or perhaps years later.

Thus, Dr. Van Der Woude's acts of negligence occurred around September 1982 and shortly thereafter. His liability then is limited to the pre-October 1, 1983, amount.

The latest negligent acts of the Alexandria Women's Clinic occurred in May 1983. They also are not liable for the increased recovery.

III. *Constitutionality of Section 8.01-581.15 of the Virginia Code*

In recent years, state legislators have been approached by various lobbying groups seeking to reduce awards in medical malpractice cases. Several state legislatures have responded to these demands by passing statutes which in one fashion or another limit awards in these cases.

The response of the Virginia legislature to these demands was the passage of a statute which limited recovery to a maximum of $750,000 against a health care provider. A

later version of the same act increased the maximum recovery to $1,000,000. Several states have dealt with the constitutional issue of limited recovery in medical malpractice suits with varying results.

The most recent event affecting the constitutionality of the Virginia Act is the opinion rendered by Judge James H. Michael, Jr., of the United States District Court for the Western District of Virginia, rendered in the Charlottesville Division of that Court on November 5, 1986, in the case of *Helen C. Boyd* v. *R. A. Bulala, M.D.,* Civil Action 83-0557-A-C. [647 F. Supp. 781 (W.D. Va. 1986)]

Judge Michael found that the Virginia Act is unconstitutional under Article 1, Section 11, of the Virginia Constitution and also that the Act impermissibly interferes with the function of the judicial branch, thereby violating the separation of powers between branches of government. Judge Michael found the Act to be constitutional under the Equal Protection Clause of the 14th Amendment.

I agree with Judge Michael that this act does not meet constitutional standards. While I support his concern that the act imposes severe limitations on the Constitutional right to a jury trial,[1] I would posit my conclusion

---

[1] Judge Michael argues that "Since the assessment of damages is a fact issue committed to the jury for resolution, a limitation on the performance of that function is a limitation on the role of the jury. Since the right to a jury as the fact-finder is guaranteed under the seventh amendment, it therefore follows that such a limitation is unconstitutional under the provisions of that amendment." Michael Memorandum Opinion, page 13.

While there is no doubt that the placement of a limitation on damages is an interference with the jury process, the Supreme Court may not conclude that the limitation on the jury as a fact finder is a violation of the Seventh Amendment. The language in McKeiver v. Pennsylvania, 403 U.S. 528 (1971), at page 659, may suggest otherwise. "But one cannot say that in our legal system the jury is a necessary component of accurate fact-finding. There is much to be said for it, to be sure, but we have been content to pursue other ways for determining facts.- Juries are not required, and have not been, for example, in equity cases, in workmen's compensation, in probate, or in deportation cases." The court in McKeiver, supra, refused to extend the right to a jury, guaranteed by the sixth amendment in criminal trials, to juveniles charged with criminal acts in delinquency proceedings in a juvenile court.

The seventh amendment argument would probably revolve around questions of due process which have in several cases been resolved in favor of legislative initia-

that the act is unconstitutional under equal protection analysis.

## Standards Applies to Equal Protection Claims

The United States Supreme Court has traditionally employed one of two different standards to analyze equal protection claims. A "strict scrutiny" test is used whenever a state action discriminates against a suspect class or infringes upon a fundamental right. Classifications by race, national origin, and sometimes alienage are viewed as suspect and thus deserving of strict scrutiny. Some rights which are deemed to be fundamental and give rise to strict scrutiny include, the right to vote; to interstate travel; the right to criminal appeal and to privacy. The Supreme Court has recognized other rights as fundamental and thus deserving of the protection of strict scrutiny. The standard requires that the state action must serve a compelling governmental purpose. *See Loving v. Virginia*, 388 U.S. 1 (1967). Few state actions are found constitutional under the strict scrutiny test.

The second analytical standard traditionally used is often referred to as the "rational basis" test. This standard accepts state actions as constitutional so long as they are rationally related to a legitimate government interest. *See McGowan v. Maryland*, 366 U.S. 420, 6 L. Ed. 2d 393 (1961). Few state actions are found unconstitutional under the rational basis test.

During the late 1960's and 1970's, the Supreme Court articulated an intermediate level of scrutiny which so far has only been applied to discriminatory state actions based on gender or illegitimacy ("quasi suspect" classes).

---

tive. See Williams v. Florida, 399 U.S. 78 (1970), Apodeca v. Oregon, 406 U.S. 404 (1972), Ballew v. Georgia, 435 U.S. 223 (1978), and Sebrest v. Brets, 437 U.S. 28 (1978). See also Lochner v. New York, (1905) 198 U.S. 45, expressing the now abandoned substantive due process standard. A finding in favor of the unconstitutionality of various statutes based upon the right to a jury trial would invalidate many of the statutes upheld under equal protection analysis. Nevertheless, the right to a jury trial in a civil case is one of the rights in the Bill of Rights and courts may have given the seventh amendment less deference than our historical roots demand. Judge Michael's opinion raises thoughtful questions for constitutional scholars.

The Court has declined to extend this standard to cover other classifications. Sometimes labeled the "means focused test," this standard requires that a classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation. . ." or other state action. *Reed* v. *Reed*, 404 U.S. 71, 75-76 (1971), 30 L. Ed. 2d 225, 229, quoting *Royster Guano Company* v. *Virginia*, 253 U.S. 412, 415, 64 L. Ed. 989, 990 (1920).

Some writers contend that these three identified standards have been tacitly augmented with yet another level of review by recent Supreme Court cases. (For an extensive discussion of this purported new standard, *see Coburn* v. *Agustin*, 627 F. Supp. 983 (D. Kan. 1983). The writers argue that there is a new "heightened scrutiny" standard that is used in certain cases that nominally fall under the rational basis test.

An example of such cases is *City of Cleburne* v. *Cleburne Living Center*, 473 U.S. 432, 87 L. Ed. 2d 313 (1985). *Cleburne* involved an equal protection challenge to an ordinance requiring that a group home for the retarded obtain a special use permit before operation.

Despite the fact that the Justices unanimously held the ordinance unconstitutional, the *Cleburne* decision was badly fragmented. Justice White writing for the Court argued that the traditional rational basis test was used. Justice Stevens, joined by Chief Justice Burger concurred but argued that the three levels of review were essentially mythical and that all the Court's decisions represented a generally consistent search for rational basis. Justice Marshall, joined by Justices Blackmun and Brennan, also concurred but argued that the decision represented a new level of review, heightened scrutiny within the general heading of rational basis analysis.

The Court found that the rational basis test should apply because no suspect or quasi suspect classification was involved and no fundamental rights were implicated. The decision relied on the fact that the record did not reveal a rational basis for believing that the home would pose any special threat to the City's legitimate interests. 87 L. Ed. 2d at 327.

The *Cleburne* Court looked to the *actual* facts in the record for support for the legislation and found them insufficient to withstand rational basis analysis. This

tack differs from the traditional approach which does not scrutinize the facts on the record to determine whether the legislature acted properly. Under the traditional approach, the Court will accept any plausible basis which may underlie the legislation. For example, see *U.S. Railroad Retirement Board* v. *Fritz*, 449 U.S. 166, 66 L. Ed. 2d 368 (1980), and *McGowan* v. *Maryland*, 366 U.S. 420, 6 L. Ed. 2d 393 (1961). The *Cleburne* approach, according to some writers, is significantly less deferential than the traditional test to the actions of state legislatures.

Thus, arguably there are four levels of review which may apply: strict scrutiny, intermediate scrutiny, rational basis with heightened scrutiny, and simple rational basis. With the two traditional standards, the selection of the standard to be applied in a given case was nearly always dispositive of the equal protection claim. The newer approaches entail a more careful consideration of the challenged legislation.

### Selecting the analytical standards in the case at bar

### Strict scrutiny

No court has yet applied strict scrutiny analysis in considering equal protection challenges to statutes limiting medical malpractice recoveries. None of the traditional suspect classes is singled out by the statutes, and the courts have held that "the right to a full recovery in tort" is not a fundamental right worthy of strict scrutiny protection.

It appears that both the suspect class and fundamental rights categories are not open to further additions in equal protection analysis under the Federal Constitution. "Suspect classes" appear to include only race, national origin and alienage. "Fundamental rights" appear to include only the previously recognized rights (e.g., the rights to vote, travel, privacy, and the right to criminal appeal).

### Intermediate scrutiny

Several courts have used intermediate scrutiny analysis in reviewing these statutes. Every time that a court has used the intermediate scrutiny approach such statutes have been found unconstitutional. (For example, see *Jones*

v. *State Board of Medicine*, 555 P.2d 399 (Idaho 1976); *Arneson* v. *Olson*, 270 N.W.2d 125 (North Dakota 1978); and *Carlson* v. *Maurer*, 424 A.2d 825 (New Hampshire 1980). In each of these cases, the courts found that there was an insufficient relationship between the legislative objective and the means selected to accomplish it: that is, they felt that the goal of supporting the health care industry did not justify the hardship imposed solely upon those most severely injured due to medical malpractice.

It should be noted that these cases were all decided during the "season" of the intermediate scrutiny approach. During the late 1960's and the 1970's, the Supreme Court applied intermediate scrutiny analysis to state actions using classifications by gender (*e.g.*, *Reed* v. *Reed*, 404 U.S. 71, 30 E. Ed. 2d 225 (1971)) and illegitimacy (*e.g.*, *Levi* v. *Louisiana*, 391 U.S. 68, 20 L. Ed. 2d 436 (1967)). However, the Supreme Court has declined to expand the number of "quasi suspect" classes.

In *Cleburne, supra*, the Court reversed the Fifth Circuit holding that the mentally retarded constituted a quasi suspect classification entitled to intermediate level scrutiny. Another apt example is *Dandridge* v. *Williams*, 397 U.S. 471, 25 L. Ed. 2d 491 (1970), where the Court declined to give intermediate scrutiny to a Maryland statute which placed a cap on the total amount a family could receive under the Aid to Families with Dependent Children program. The Court declined to treat as quasi suspect a classification of the state's most needy children. Thus, as with the suspect classes and fundamental rights, the quasi suspect category may be viewed as closed and not susceptible to expansion to include further classifications.

In an interesting variation, acknowledging the general rule that the classes are closed, under analysis in Federal equal protection cases, but finding an exception in the State Constitution, the New Hampshire court in *Carlson* v. *Maurer*, 424 A.2d 825 (New Hampshire 1980), applied intermediate scrutiny to a statute limiting medical malpractice recoveries. The Court acknowledged that the Supreme Court had recently restricted the use of the standard to classifications by gender or illegitimacy, but then pointed out that "[i]n interpreting our State constitution, however, we are not confined to federal constitutional standards and are free to grant individuals more rights

that (sic) the Federal Constitution requires." *Id.* at 831. The New Hampshire court went on to apply intermediate scrutiny and found a statute limiting recoveries for non-economic losses unconstitutional.

The two more recent state cases invalidating such statutes on equal protection grounds have not expressly used the intermediate scrutiny approach. *Duren* v. *Suburban Community Hospital*, 482 N.E.2d 1358 (Ohio Ct. of Common Pleas 1985); *Detar Hospital, Inc.* v. *Estrada*, 694 S.W.2d 359 (Texas Ct. of Appeals 1985). This suggests some acquiescence in the restriction of the intermediate scrutiny standard to gender and illegitimacy cases.

### The rational basis standard

A few recent decisions indicate that a rational basis standard was used in considering challenges to these statutes under the equal protection clause of the federal constitution. In 1985, the Ninth Circuit of the United States Court of Appeals held that the traditional rational basis test was the correct standard for an equal protection challenge to a California statute limiting recoveries for non-economic losses in medical malpractice cases. *Hoffman* v. *United States*, 767 F.2d 1431 (9th Cir. 1985). The Court upheld the statute, finding that the legislature could reasonably believe that the statute would help reduce insurance premiums. *Id.* at 1437.

The *Hoffman* Court found that the statute did not implicate suspect classes, fundamental rights or quasi suspect classes. *Id.* at 1436. The Court referred to decisions in the Fourth, Fifth and Eighth Circuits all applying the rational basis test to statutes regulating other aspects of medical malpractice litigation. *Id.* at 1436. While the challenged statutes did classify medical malpractice victims by treating them differently from other tort victims, unlike the recovery limitation they did not create a tiny class comprised entirely of the most severely injured. (*Woods* v. *Holy Cross Hospital*, 591 F.2d 1164 (5th Cir. 1979), involving a Florida statute imposing mediation procedures; *DiAntonio* v. *Northampton-Accomack Memorial Hospital*, 628 F.2d 287 (4th Cir. 1980), involving a Virginia statute requiring plaintiffs to file a notice of intention prior to filing a medical malpractice action, imposing mediation proceedings, and

requiring use of panels of physicians and lawyers; *Fitz v. Dolyak,* 712 F.2d 330 (8th Cir. 1983), involving an Iowa statute imposing six year statute of limitations on most medical malpractice actions.)

It must be acknowledged that, together with *Hoffman,* all the Federal Circuit Court decisions dealing with equal protection challenges to state medical malpractice statutes have applied the rational basis test.

In fact, Judge Michael applied the traditional rational basis test in considering an equal protection challenge to the Virginia medical malpractice recovery limitation. *Boyd* v. *Bulala, supra.* The *Boyd* court held that the Virginia statute did not violate the equal protection clause.

In addition to these cases, the United States Supreme Court denied an appeal from a decision of the Supreme Court of California upholding a limitation on recoveries for non-economic losses based on a rational basis analysis. *Fein* v. *Permanente Medical Group,* 695 P.2d 665, *appeal denied,* 88 L. Ed. 2d 215 (1985). The Supreme Court dismissed the appeal summarily for want of a substantial federal question. A summary dismissal is viewed as a decision on the merits creating controlling precedent. (*See Hicks* v. *Miranda,* 422 U.S. 332, 45 L. Ed. 2d 223 (1975). The dismissal does not, however, mean that the Supreme Court has approved the reasoning of the California decision (i.e., using a rational basis test): it only affirms the decision on the merits.

If the validated California statute were like the Virginia statute and limited all recovery, for economic as well as non-economic losses, then the dismissal might well be dispositive of our case. However, due to the differences in the statutes it is difficult to say what effect the dismissal should have. There is little doubt that the already divided California Court would not have approved the Virginia Statutory scheme since that court in *Fein* quotes with approval the American Bar Association's Commission on Medical Professional Liability which describes an arbitrary ceiling on recovery as "unconscionable."

### Applying the rational basis test

In the past, the selection of the rational basis test was tantamount to finding a challenged statute constitutional. Only wholly arbitrary statutes would fail the

test. With the advent of *Cleburne*, it may be that rational basis analysis has become more rigorous. While a majority in *Cleburne* did not admit that anything other than the traditional standard was being applied, Justice Marshall in a concurring opinion joined by Justices Blackmun and Brennan argued that the Court was in fact applying a higher level of scrutiny. 87 L. Ed. 2d at 330.

One court has attempted to apply *Cleburne* in considering an equal protection challenge to a Kansas statute abrogating the collateral source rule for medical malpractice cases. *Coburn* v. *Agustin*, 627 F. Supp. 983 (D. Kan. 1985). The District Court concluded that *Cleburne* had set forth a bifurcated rational basis test, with one level the traditional deferential approach and the other calling for "heightened scrutiny." The District Court determined that heightened scrutiny should be afforded where statutes affect a "sensitive class" or an "important right." *Id*. at 993. The District Court found the statute unconstitutional because it bore no rational relationship to the factual problem before the Kansas legislature.

A close reading of *Cleburne* suggests that the essential atypical factor was that, without dissent, the Court carefully considered the facts actually before the legislature when the ordinance was enacted. The issue of whether or not the Court should inquire into the facts before the legislature and the actual purpose of the legislature has been hotly contested. For example, *see U. S. Railroad Retirement Board* v. *Fritz*, 449 U.S. 166, 66 L. Ed. 2d 368 (1980), where three different views on the question were reported. The majority in *Fritz* followed the traditional view that *any* plausible reason for the statute is sufficient, and that a review of the actual basis of the legislation is irrelevant.

In fact, *Cleburne* does not pronounce any clear criteria for determining when the purported "heightened scrutiny" under the rational basis umbrella should be used. Since the case involved a classification affecting the mentally retarded, it may be that the *Coburn* court was correct and the Supreme Court would afford heightened scrutiny protection to the burdening of other "sensitive" classifications or "important" rights. If that were indeed the rationale, then a classification of those most severely injured due to medical malpractice might also receive heightened scrutiny. The class certainly is at a disadvan-

tage against such powerful groups as the health care provider and insurance industries. On the other hand, the *Cleburne* result may simply be based on the fact that the record lacked *any* facts to support the ordinance (i.e., the ordinance was arbitrary) rather than because of any new analytical standard. *Cleburne's* effect is highly speculative since the holding remains something of a mystery.

If the precedent of *Hoffman*, 767 F.2d 1431 (9th Cir. 1985), is followed, then the traditional rational basis test would be used and the Virginia statute would be found constitutional. The facts and purposes recited by the legislature in Chapter 611 of the 1976 Acts of Assembly 784 state a plausible rational basis for the legislation.

Approved April 9, 1976

Whereas, the General Assembly has determined that it is becoming increasingly difficult for health care providers of the Commonwealth to obtain medical malpractice insurance with limits at affordable rates in excess of $750,000; and

Whereas, the difficulty, cost and potential unavailability of such insurance has caused health care providers to cease providing services or to retire prematurely and has become a substantial impairment to health care providers entering into practice in the Commonwealth and reduces or will tend to reduce the number of young people interested in or willing to enter health care careers; and

Whereas, these factors constitute a significant problem adversely affecting the public health, safety and welfare which necessitates the imposition of a limitation on the liability of health care providers in tort actions commonly referred to as medical malpractice cases; now, therefore,

Be it enacted by the General Assembly of Virginia: 1. That the Code of Virginia is amended by adding sections numbered 8-654.8, 8-654.9, 8-654.10 and 38.1-389.3 and by adding in Title 8 a chapter numbered 39, consisting

of sections numbered 8-911 through 8-922, as follows:

Section 8-654.8. *Limitation on recovery in certain actions.*--In any verdict returned against a health care provider in an action for malpractice where the act or acts of malpractice occurred on or after April one, nineteen hundred seventy-seven which is tried by a jury or in any judgment entered against a health care provider in such an action which is tried without a jury, the total amount recoverable for any injury to, or death of, a patient shall not exceed seven hundred fifty thousand dollars.

In interpreting this section, the definitions found in § 8-911 of the Code of Virginia shall be applicable.

This result would obtain even if many of the "facts" relied upon were actually untrue.

The most difficult question is how the statute should be treated if *Hoffman* is not followed and "heightened scrutiny" is used. Such scrutiny would take into account the record actually before the legislature. Contrary to some representations made at the time the statute was enrolled, there was no real malpractice insurance crisis in Virginia. There was no evidence that health care providers were declining to practice in Virginia due to high premiums. (*See* 16 *University of Richmond Law Review* 799 (Summer 1982).)

The issue is further complicated by the fact that soon after the statute was enrolled, a national malpractice insurance crisis came to be recognized. Thus, even if the statute was initially unjustified, later events have lent it support. After this real crisis was recognized. as affecting Virginia, the statute was amended to raise the limitation from $750,000 to $1,000,000.

Nevertheless, despite the national malpractice insurance crisis, young doctors continue to choose to practice in Virginia. Proportionately, their numbers, in fact, are outpacing the rapid growth in Virginia's population.

There is no doubt however that this statute passes scrutiny under the rational basis test.

*The test to be applied to the case at bar*

In a Note, *Legislative Purpose, Rationality and Equal Protection,* 82 Yale L. J. 123, 128 (1972), the author states:

> [i]t is always possible to define the legislative purpose of a statute in such a way that the Statutory Classification is rationally related to it. When a statute names a class, that class must share some common characteristic for that is the definitional attribute of a "class." The nature of the burdens or benefits created by a statute and the nature of the chosen class commonality will always suggest a statutory purpose--to so burden or benefit the common trait shared by members of the identified class. A statute's classification will be rationally related to such a purpose because the reason of the purpose has been derived from the classifications themselves.

The statement above clearly demonstrates the tautology that the rational basis test will yield. When the legislature defines a class and states what it wishes to do with it, barring occasional aberrations, the legislative purpose is rationally related to the law enacted.

In *Cleburne, ante,* the Supreme Court broke through the tautology by suggesting that although the ordinance was rationally related to a particular purpose that purpose was illegitimate. "Mere negative attitudes are not permissible bases for treating a home for the mentally retarded differently." *Cleburne,* 473 U.S. 432, 87 L. Ed. 2d 313, 326.

The District court in *Coburn* used this departure from rational basis to call for "heightened" scrutiny where statutes affect a "sensitive class" or an "important right."

The rigid methodology employed by the Supreme Court will always yield *Cleburne* cases where the court shies away from creating a broad suspect category such as "retarded persons" in *Cleburne* or "poor children" in the *Dandridge* case, because the potential for challenges to legislation affecting these classes is almost limitless. On the other

hand, rational basis, strictly applied, gives no standard of review worthy of the Equal Protection Clause.

Doubtless, Justice Stevens will ultimately prevail in his formulation that the test is whether "an impartial lawmaker could logically believe that the classification would serve a legitimate public purpose that transcends the harm to members of the disadvantaged class."

Nevertheless, we are confined to standards presently articulated by a majority of the Court. In the case at bar we will apply the rational basis test but with the "heightened scrutiny" suggested by *Cleburne*.

### Heightened scrutiny

The arbitrary limitation on fundamental rights in equal protection analysis yields an interesting dichotomy. The inferred "right to privacy" will trigger strict scrutiny while the right to a jury trial enumerated in the Bill of Rights is only subject to the rational basis test.

Perhaps to escape this dilemma, courts have referred to the cases imposing a limitation on recoveries in medical malpractice cases as the "right to a full recovery in tort."

In *Boyd* v. *Bulala, ante,* Judge Michael found the Virginia Statute complied with the constitutional requirements of the Equal Protection clause by applying the rational basis test. Judge Michael rejected stricter scrutiny by declaring the right to a full recovery in tort is not a right guaranteed by the constitution. This position follows the opinion of the Federal Circuit Court of Appeals in *Hoffman* described more fully earlier in this opinion.

Judge Michael does find the Virginia statute unconstitutional on the grounds that it violates the Seventh Amendment right to a jury trial and the right to a jury trial under Article 1, Section 11, of the Virginia Constitution. In a carefully phrased opinion, he finds the Virginia statute violates the jury's role as a fact finder, a right guaranteed under both the Federal and State constitutions. There is no doubt that the limitation on recovery severely limits the jury function and creates an artificial ceiling on recovery which may well be contrary to all the facts produced at trial.

The characterization of the limitation on recovery in medical malpractice as affecting "the plaintiff's right to full recovery in tort" is inaccurate. Tort encompasses every recovery for a civil wrong. Thus, the class defined by that phrase would conceivably affect the right of every citizen not just the special limited group of those injured by the negligent acts of a health care provider. Further, it suggests that the "tort" system is somehow different from the jury system.

It may be a rudimentary explanation but the right to a civil jury trial is a powerful right given to the people of Virginia by our ancestors. The words of grant are simple yet poignant and bear repeating.

The Virginia Constitution, Article I, Section 11, reads in pertinent part:

> That in controversies respecting property and in suits between man and man, trial by jury is preferable to any other, and ought to be held sacred.

This language, essentially unchanged, has been in our Constitution since 1776.

Two Virginia cases dealing with this right to a jury trial in a civil case illustrate the construction placed upon that right by our courts.

In the case of *James* v. *Stokes*, 77 Va. 225 (1883), the plaintiff directed the defendant to issue three notes to secure a debt of $126.73. At that time, the jurisdictional limit of the magistrate's court was $50. The Supreme Court of Virginia found that the suits brought in the magistrate's court on each of the notes which were in the amount of $42.24 was an attempt to deny the defendant the rights to trial by jury. The court opinion states at page 228:

> The laws are framed and enacted by the people for the common benefit; and among the fundamental principles of our government we find trial by jury is guaranteed to the citizens.

A second case, *Buntin and Wife* v. *City of Danville*, 93 Va. 200 (1896), discussed an incident where the trial judge excoriated the jury for their failure to reach a

timely verdict. At page 212 the Supreme Court of Virginia states:

> Trial by jury is a sacred right and should be sedulously guarded. The jury should not only be kept from all extraneous influences in reaching their verdict, but the court itself should be careful not to trench upon their province. A verdict resulting from coercion could not be allowed to stand. It must be the untrammeled "expression of the concurrence of individual judgments."

The small debt divided into three smaller ones to invoke the jurisdiction of the magistrate's court seems trivial. The Judge's railing at the jury for their delay in reaching a verdict, while improper, does not seem to invoke serious constitutional questions. Yet both of these courts, correctly, in my view, asserted the duty of the Court to uphold the right to trial by jury. Each Court invoked the words of the Virginia Constitution, set forth above, as the basic premise for its ruling.

It is true that neither of these cases involve statutory actions of the legislature. They are cited because both involve a strict view of the right to a jury trial. In the one case, the court will not allow a lessening of the jurisdiction for a jury trial. In the second case, the court will not allow invasion upon the province of a jury to render its own verdict. These cases strongly suggest that Virginia will not allow the right to a jury trial to be modified without strong scrutiny by the courts.

The right to a civil jury trial has been placed by Virginia courts in its historical context, as it existed at the birth of our nation.

In the case of *Bowman v. Virginia State Entomologist*, 128 Va. 351, 105 S.E. 141 (1920), our State Supreme Court held that "[i]t has long been well settled that neither the State nor Federal Constitution guarantees or preserves the right of trial by jury except in those cases where it existed when those constitutions were adopted." When the constitutions were adopted, the right to trial by jury existed in the common law of England and we retained those same distinctions.

The right to trial by jury in Virginia does not apply to suits in chancery, demurrers to the evidence, cases agreed, special verdicts, and other methods of procedure. *W. S. Forbes & Co.* v. *Southern Cotton Oil Co.*, 130 Va. 245, 108 S.E. 15 (1921).

But the right to a jury in civil cases does apply to actions in tort and in the words of our constitution is a "sacred" right. Characterizing this fundamental right as the right to full recovery in tort is a homely but accurate term equal to describing the First Amendment guarantee of freedom of speech as the right to comment adversely on the inadequacies of one's government. Both are limited descriptions of broader principles embodied in our constitutions.

The Virginia right to a jury trial is more explicit than the Federal Constitutional grant and is a basic right of our people. Since under Federal Constitutional analysis the class of fundamental rights requiring strict scrutiny is closed and the right to a civil jury trial is not deemed a fundamental right under that analysis, it is at least an *"important"* right demanding "heightened scrutiny."

The class defined by our statute is particularly "sensitive." It is comprised of those persons most seriously injured by the negligence of medical care providers. The numbers of the class are few and their injuries are great.

The Supreme Court has defined impermissible purposes of legislation in various ways. A state may not favor long term residents over short term residents, *Zobel* v. *Alaska*, 457 U.S. 55, 72 L. Ed. 2d 672 (1982); *Hooper* v. *Bernadillo County*, 472 U.S. 612, 86 L. Ed. 2d 487 (1985); current residents over nonresidents; *Metropolitan Life Ins.* v. *Ward*, 470 U.S. 869, 84 L. Ed. 2d 751 (1985); *Williams* v. *Vermont*, 472 U.S. 14, 82 L. Ed. 2d 11 (1985).

Long or short term residents, in or out of state residents, form large classes. It is not the class that creates the impermissible legislative purpose but the pure discriminatory action of the state and the abject unfairness of favoring one of these classes to the detriment of the other.

The number of cases involving the medical malpractice limitation may be fewer than ten in the ten years of its existence. The limitation is indiscriminate in that it is a general limitation regardless of the injuries

proven. The beneficiary of the limitation has not been the general public since the size of the affected group is too small to have any effect on general insurance premiums. Plainly stated, the beneficiaries of the limitation are those who have committed a civil wrong and the disadvantaged class are those most severely injured by that wrong. Blocking full recovery in these cases by the artificial limitation achieves no discernibly legitimate state goals.

That is not to say that the legislature has no control over legal remedies or damages in general. They obviously have that power. But legislation must define broader classes, and avoid creating and injuring "discrete and insular minorities" that benefit only special interests and the law must define goals that "rationally"[2] serve the public interest.

"The right to trial by jury in Virginia is preferable to any other and ought to be held sacred." As long as that charge stands in the Virginia Constitution, no Virginia Court will allow tampering with that right without subjecting the legislation to scrutiny that will require some balancing of interest between the beneficiary class and the burdened group.

This legislation forms a small powerless group with no conceivable benefit to the public at large except an illusion of action. The function of the jury trial is altered so that regardless of the facts produced, the court must reduce the verdict to a predetermined limitation. A sensitive class is formed and the important fundamental right to trial by jury is diminished by this legislation. In view of this finding, the plaintiff is entitled to her full recovery consistent with the jury verdict and the issues discussed in part I and part II of this opinion [are] rendered moot.

[2] United States v. Carolene Products Co., 304 U.S. 144, 154, n. 4, 82 L. Ed. 1234, n. 4 (1938).